KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
OLEG ELKHUNOVICH (269238)
oeklhunovich@susmangodfrey.com
MICHAEL GERVAIS (330731)
mgervais@susmangodfrey.com
LEAR JIANG (338600)
ljiang@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California  90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150

CHANLER LANGHAM (*Pro Hac Vice to be submitted*)
clangham@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas  77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND/SAN FRANCISCO DIVISION

| | |
|---|---|
| META PLATFORMS, INC., a Delaware corporation;<br><br>                    Plaintiff,<br>          v.<br><br>Social Data Trading Ltd., d/b/a "SOCIAL DATA," "SOCIALDATA.HK," and "IQDATA.SOCIAL"<br><br>                    Defendant. | Case No. ___21-9807___<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc., alleges the following:

1

**INTRODUCTION**

2

1.      Beginning no later than September 2020 and continuing to at least September 2021,

3

Defendant Social Data Trading Ltd. operated an unlawful service designed to improperly collect or

4

"scrape" account profiles from various websites, including Instagram, YouTube, and TikTok.

5

Defendant claimed to have collected account profiles for more than 91 million Instagram users, 5.5

6

million TikTok users, and 3.9 million YouTube users.  As to Instagram, Defendant used automated

7

Instagram accounts and a network of computers or "bots," which pretended to be mobile Android

8

devices connected to the official Instagram app, to scrape publicly viewable profiles of Instagram

9

users, including the username, profile photo, number of followers, posts, and likes, and information

10

about their followers, including gender, language, and location.  Defendant sold data scraped from

11

Instagram, YouTube, and TikTok as "demographics" and "insights" about "influencers and their

12

audiences."  Exhibit A.

13

2.      Beginning no later than May 20, 2021, Plaintiff notified Defendant of its violations,

14

disabled its accounts, and revoked Defendant's access to its service.  Defendant then began using

15

a new business name to access and scrape profiles of Instagram users.  Plaintiff brings this action

16

to stop Defendant's violations of Instagram's Terms of Use and the California Comprehensive

17

Computer Data Access and Fraud Act, California Penal Code § 502.  Plaintiff also brings this action

18

for damages and disgorgement for breach of contract and unjust enrichment.

19

**PARTIES**

20

3.      Plaintiff Meta is a Delaware corporation with its principal place of business in

21

Menlo Park, San Mateo County, California.

22

4.      Defendant Social Data Trading Ltd. is a limited liability company registered in Hong

23

Kong, China.  Exhibit B.  According to its website socialdata.hk, which Defendant used between

24

September 2020 and May 20, 2021, Defendant sold "in-depth insights into the demographics and

25

psychographics of influencers and their audiences" derived from social media platforms, including

26

Instagram, YouTube, and TikTok.  Exhibits A, C.  On April 15, 2021, as part of its enforcement

27

efforts, Meta blocked internet traffic from Instagram and Facebook to the socialdata.hk website.

28

Approximately a month later, on May 17, 2021, Defendant anonymously registered the replacement website IQdata.social and used it to sell account profiles scraped from Instagram.

5.    According to corporate records, Alexei Poliakov and Adhar Singh are the principals of Defendant, manage its business and operations, and reside in Russia.

6.    According to his LinkedIn profile, Poliakov was previously employed by at least one other company ("Deep.Social") that Meta previously enforced against for scraping Instagram in 2018.  Deep.Social purportedly ceased operations in August of 2018 and by August 2019, Defendant was registered as "Social Data Trading Ltd." in Hong Kong, China.  Also in 2019 and 2020, Poliakov retained nominee directors for Social Data Trading Ltd., namely, Carol Joubert (from August 20, 2019 to March 20, 2020), and Mariska Supra (March 20, 2020 to the present) (the "Nominee Directors") to act at his direction. Exhibits D, E, F.  The Nominee Directors retained for Defendant in 2019 and 2020 were directors of Social Data Trading Ltd. in name only and were not involved in the company's day to day activities.

7.    According to his LinkedIn profile, Singh was also previously employed at Deep.Social until 2019.

8.    On information and belief, Poliakov and Singh were also associated with a third company ("Social Data Ltd.") that Meta has also previously enforced against for scraping Facebook and Instagram.  Social Data Ltd. purportedly ceased operations in 2020.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction under 28 U.S.C. § 1332 over all causes of action alleged in this complaint because complete diversity exists and the amount in controversy exceeds $75,000.

10.    The Court has personal jurisdiction over Defendant because Defendant created and used multiple Instagram accounts thereby agreeing to Instagram's Terms of Use, and submitting to the personal jurisdiction of this Court for litigating this matter.

11.    In addition, the Court has personal jurisdiction because Defendant purposefully directed its conduct at California and at Plaintiff, which has its principal place of business in California.  Defendant's business depends on accessing and scraping Instagram.  Since at least

September 2020, Defendant has transacted business and engaged in commerce in California by, among other things, purposefully scraping the Instagram accounts of approximately 250,000 California users. Plaintiff's claims arise directly from all of these California contacts.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) as the threatened and actual harm to the Plaintiff occurred in this district.

13.    Pursuant to Civil L.R. 3-2(c), this case may be assigned to either the San Francisco or Oakland division because Meta is located in San Mateo County.

## FACTUAL ALLEGATIONS

**A.    Background on Meta and the Facebook and Instagram Platforms**

14.    Meta operates Facebook, a social networking website and mobile application that enables its users to create their own personal profiles and connect with each other on their personal computers and mobile devices.

15.    Meta also operates Instagram, a photo and video sharing service, website and mobile application, and social network.  Instagram users can post photos and videos to their profile.  They can also view, comment on, and like posts shared by others on Instagram.  The Instagram service is a Meta product.

16.    When an Instagram user posts a photo, other Instagram users can view the photo and choose to "like" or "comment" on it.  Depending on the users' privacy settings, only approved followers of an account may see certain users' posts or the users' posts may be viewable by all Instagram users.  Users can change their privacy settings at any time.

17.    Instagram users can tag their photos with hashtags—words or phrases preceded by a number or hash sign (#)—that indicate that the post is about a specific topic.  Other users can then search for hashtags to find content related to various topics.

18.    Instagram users can gain followers, views, and likes, but only from other registered Instagram users.  To create and use an Instagram account, users must enter a valid email address or phone number, which requires a confirmation code, and must register a unique username and password.

19.     Instagram can be viewed using the Instagram mobile application ("Official IG App") or at the website www.instagram.com.  The Official IG App is a mobile application designed by Meta that users can download onto their mobile device.  Communications made by authenticated Instagram users, using the Official IG App, are sent to Meta computers, which then return information to allow a user to experience the Instagram service on the Official IG App.

### B.     Instagram's Terms of Use

20.     Everyone who creates and uses an Instagram account agrees to Instagram's Terms of Use ("Instagram's Terms") (available at https://help.instagram.com/581066165581870) and other policies that govern access to and use of Instagram.  Because Instagram is a Facebook (now Meta) product, the Instagram Terms of Use constitute an agreement between Instagram users and Meta.  *Id*.; *see also* "Facebook Products," available at https://www.facebook.com/help/1561485474074139?ref=igtos.

21.     Since at least April 2018, Instagram's Terms prohibit users from (a) "do[ing] anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose;" (b) "creating accounts or collecting information in an automated way"; (c) using Instagram if Meta "previously disabled your account for violation of law or any of [Instagram's] policies"; and (d) "help[ing] or encourag[ing] others to violate" Instagram's Terms and policies.

### C.     Defendant Agreed to Instagram's Terms

22.     At all times relevant to this case, Defendant was bound by Instagram's Terms.

23.     Defendant's principal Adhar Singh created and used several Instagram accounts, including on December 14, 2012; March 26, 2017; November 3, 2018; January 30, 2019; March 30, 2019; and May 15, 2021.  Defendant's principal Alexei Poliakov also created and used several Instagram accounts, including on September 5, 2013; October 14, 2016; July 11, 2017; January 12, 2018; April 24, 2018; and January 18, 2019. In addition, between September 2020 and at least September 2021, Defendant used thousands of automated Instagram accounts to scrape data from Instagram.

D.    **Background on Scraping**

24.    Scraping is a form of data collection that relies on unauthorized automation for the purpose of extracting data from a website or app.  Defendant's own Terms of Service define scraping as: "obtaining information contained on websites through automated means. Same information may be obtained manually, but through automation, the speed and amount of obtained data is incomparably bigger."  Exhibit G.

25.    Meta employs a number of measures to detect and disrupt certain types of abuse of the Instagram service. For example, Meta monitors for the creation of automated accounts purporting to be individual users. Additionally, Meta monitors for and disables accounts engaged in unauthorized automated collection of data.

E.    **Defendant's Scraping Operation**

26.    From at least September 2020 until no later than May 25, 2021, Defendant used the website socialdata.hk to "offer a web scraping service."  Exhibit G. Defendant offered its customers information scraped from Instagram users' profiles, such as verified badge status, follower count, post count, number of likes, and number of comments, as well as information about certain users' followers.  Exhibits A, H.

27.    In order to scrape Instagram, Defendant used automation software (the "Scraping Software") and thousands of automated Instagram accounts to improperly collect and aggregate data.  Defendant scraped data from restricted Meta computers that are only accessible to authorized and logged in Instagram users.  Defendant programmed the Scraping Software to mimic authorized users of the Official IG App.  In fact, Defendant was not an authorized user and instead a network of computers operating virtual mobile devices for the purpose of making unauthorized automated requests for user data from Meta computers.  The Scraping Software was not able to circumvent users' privacy settings and unable to scrape data that was not otherwise viewable to a user's followers.

28.    Between September 2020 and at least September 2021, Defendant used thousands of automated Instagram accounts to scrape data from Meta computers.  In many instances, Meta

detected and disabled the accounts.  Specifically, between September 2020 and September 2021, Meta disabled thousands of automated Instagram accounts associated with Defendant.

29.     Defendant's Scraping Software scraped information about Instagram users, including the user's Instagram username, number of followers, posts, comments, and whether or not the account was confirmed to belong to a public figure, celebrity or brand, and was programmed to transmit it to Defendant's servers.

30.     Since at least September 2020, Defendant has used websites socialdata.hk or IQdata.social to sell various types of data scraped from Instagram, YouTube, and TikTok, including a product called "Audience Data."  This was compiled data scraped from the followers of Instagram users with large followings ("Influencers").  Defendant advertised that they had scraped data from 76M Instagram influencers' followers, including their gender, ethnicity, language, country and city locations, interests, and brand affinities.  Exhibits A, I.

31.     For example, customers who purchased Defendant's "Audience Data" product entered the username of an Instagram user about whom they sought data into the search bar of socialdata.hk.  Exhibit I.  Defendant then generated a report with information scraped from that account, including, for example, the user's Instagram username, number of followers, number of posts, number of comments, and the verified status of the account, which shows whether Instagram has confirmed that an account is the authentic presence of the individual or brand it represents. *E.g.*, Exhibit J.  In addition, Defendant's report included information about the user's followers, including, for example, the followers' age, gender, and location.  *Id.*

**F.     Meta's Past Enforcement Actions against Defendant**

32.     Since September 2020, Meta has taken multiple enforcement actions against Defendant for violating Instagram's Terms and disabled thousands of automated Instagram accounts associated with Defendant.

33.     On or about April 15, 2021, after Meta detected scraping activity associated with Defendant's domain socialdata.hk, Meta blocked the domain socialdata.hk from the Facebook and Instagram platforms. On or about May 17, 2021, Defendant used a proxy service to anonymously

register the domain IQdata.social and began using the website IQdata.social to sell data scraped from Instagram.  Exhibits K, L.   Approximately one week later, Defendant stopped using the website socialdata.hk.

34.      On or about May 20, 2021, Meta sent Defendant a cease and desist letter, notifying Defendant of its violations of Instagram's Terms, demanding that Defendant stop these violations, and revoking its access to Instagram.  Meta also requested Defendant delete all data scraped from Facebook and Instagram. Exhibit M.

35.      On or about May 22, 2021, Singh responded on behalf of Defendant, acknowledged scraping data from Instagram "with the use of technology," and stated it was a "fundamental right." Exhibit N.  Despite Meta's technical enforcement and cease and desist letter, as of September 13, 2021, Defendant continues to scrape Instagram user profiles.

**G.      Defendant Unjustly Enriched Itself and Harmed Meta**

36.      Defendant's violations of Instagram's Terms harmed Meta. Defendant interfered and continues to interfere with Meta's products, including Instagram.

37.      Defendant's unauthorized use of Meta's computers, computer system, and computer network has damaged Meta, including but not limited to the time and money spent investigating and mitigating Defendant's unlawful conduct, in an amount to be determined at trial, and in excess of $75,000.

38.      Since at least September 2020, Defendant has unjustly enriched itself at Meta's expense in an amount to be determined at trial.  Meta is entitled to an accounting by Defendant and a disgorgement of all unlawful profits gained from its conduct.

## FIRST CAUSE OF ACTION

(Breach of Contract)

39.      Meta realleges and incorporates all preceding paragraphs here.

40.      In order to create an account, an Instagram user must agree to abide by Instagram's Terms.

41.     Since January 2019, Defendant created and used multiple Instagram accounts and agreed to Instagram's Terms.  Defendant agreed to Instagram's Terms no later than January 30, 2019.

42.     In addition, since September 2020, Defendant has used thousands of Instagram accounts to scrape Instagram.

43.     Defendant breached the Terms by using unauthorized automated means to access Instagram and collect data from Meta computers without permission, including after Meta revoked Defendant's access to its platform.

44.     Meta has performed all conditions, covenants, and promises required of it in accordance with Instagram's Terms.

45.     Defendant's breaches have caused Meta to incur damages in an amount to be determined at trial, and in excess of $75,000.

## SECOND CAUSE OF ACTION

(California Penal Code § 502)

46.     Meta realleges and incorporates all preceding paragraphs here.

47.     Defendant's access and use of Meta's computers, computer systems, and computer network was without permission because Defendant accessed Meta's computer network after Meta disabled its Instagram accounts, blocked the domain socialdata.hk, and sent correspondence to Defendant revoking its access.  On or about May 20, 2021, Meta sent Defendant a cease and desist letter revoking Defendant's permission to access Facebook and Instagram. Meta also took technical measures to revoke Defendant's access that barred Defendant's accounts and ability to access the Instagram platform beginning no later than April 15, 2021. Nevertheless, Defendant subsequently accessed Meta's protected computers when it created and used new accounts in order to continue scraping data from Instagram, without Meta's permission.

48.     Beginning no later than June 2021, Defendant, without permission, knowingly accessed and otherwise used Meta's computers, computer system, and computer network in order

to (a) devise or execute any scheme or artifice to defraud and deceive, and (b) to wrongfully obtain money, property, or data, in violation of California Penal Code § 502(c)(1).

49.     Beginning no later than June 2021, Defendant, without permission, knowingly accessed and took, copied, and made use of data from Meta's computers, computer system, and computer network in violation of California Penal Code § 502(c)(2).

50.     Beginning no later than June 2021, Defendant knowingly and without permission used or caused to be used Meta's computer services in violation of California Penal Code § 502(c)(3).

51.     Since June 2021, Defendant knowingly and without permission accessed and caused to be accessed Meta's computers, computer systems, and/or computer networks in violation of California Penal Code § 502(c)(7).  Defendant accessed Meta's computer network after Meta disabled its Instagram accounts, blocked its domain, and sent correspondence to Defendant revoking its access.

52.     Because Meta suffered damages and losses as a result of Defendant's actions and continues to suffer damages and losses as a result of Defendant's actions, Meta is entitled to compensatory damages in an amount to be determined at trial, attorney fees, any other amount of damages proven at trial, and injunctive relief under California Penal Code § 502(e)(1) and (2).

53.     Because Defendant willfully violated California Penal Code § 502, and there is clear and convincing evidence that Defendant committed "fraud" as defined by section 3294 of the Civil Code, Meta is entitled to punitive and exemplary damages under California Penal Code § 502(e)(4).

## THIRD CAUSE OF ACTION

### (Unjust Enrichment)

54.     Plaintiff realleges and incorporates all preceding paragraphs here.

55.     Defendant's acts as alleged herein constitute unjust enrichment of Defendant at Meta's expense.

56.     Defendant accessed and used, without authorization or permission, Meta's computers, computer system, and computer network, all of which belong to Meta.

10

57.     Defendant used Meta's service, platform, and computer network to, among other things, scrape data from Instagram.

58.     Defendant received a benefit by profiting off of its unauthorized use of Meta's computers, computer system, and computer network.  But for Defendant's wrongful, unauthorized, and intentional use of Instagram, they would not have obtained such profits.

59.     Defendant's retention of the profits derived from its unauthorized use of Meta's computers, computer system, and computer network would be unjust.

60.     Defendant's unauthorized use of Meta's computers, computer system, and computer network has damaged Meta, including but not limited to the time and money spent investigating and mitigating Defendant's unlawful conduct.

61.     Meta seeks an accounting and disgorgement of Defendant's ill-gotten profits in an amount to be determined at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests judgment against Defendant as follows:

1.     That the Court enter judgment against Defendant that Defendant has:

    a.     Breached its contract with Plaintiff in violation of California law;

    b.     Violated the California Comprehensive Computer Data Access and Fraud Act, in violation of California Penal Code § 502;

    c.     Been unjustly enriched at the expense of Meta in violation of California law.

2.     That the Court enter a permanent injunction enjoining and restraining Defendant and his agents, servants, employees, successors, and assigns, and all other persons acting in concert with or conspiracy with it or affiliated with Defendant from:

    a.     Accessing or attempting to access Meta's platforms, including Facebook and Instagram, and Meta's computer systems;

    b.     Developing, offering, and marketing software or computer code intended to automate the collection of data or circumvent Meta's enforcement measures;

1

2

3

          c.          Engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Meta's platforms, including Facebook and Instagram, and Meta's computer systems;

4

5

          d.          Engaging in any activity, or facilitating others to do the same, that violates Instagram's Terms of Use and related policies;

6

7

8

          e.          Restraining Defendant from selling or distributing data of any kind obtained or purportedly obtained from Meta or its products, including Facebook and Instagram.

9

    3.    That Plaintiff be awarded damages in such amounts to be proven at trial.

10

    4.    That Plaintiff be awarded pre- and post-judgment interest as allowed by law.

11

12

    5.    That the Court grant all such other and further relief as the Court may deem just and proper.

Dated: December 20, 2021

13

14

15

                                   KALPANA SRINIVASAN
CHANLER LANGHAM
OLEG ELKHUNOVICH
MICHAEL GERVAIS
LEAR JIANG
SUSMAN GODFREY L.L.P.

16

17

                                     By:    */s/ Kalpana Srinivasan*
                                           Kalpana Srinivasan

18

19

                                     Attorneys for Plaintiff
META PLATFORMS, INC.

20

21

22

23

                                     Jessica Romero
Stacy Chen
Bridget Anne Freeman
Olivia Gonzalez
PLATFORM ENFORCEMENT AND
LITIGATION

24

25

26

27

28

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands a trial by jury on all issues triable to a jury.

3    Dated: December 20, 2021                    KALPANA SRINIVASAN
                                                CHANLER LANGHAM
4                                               OLEG ELKHUNOVICH
                                                MICHAEL GERVAIS
5                                               LEAR JIANG
                                                SUSMAN GODFREY L.L.P.
6

7                                               By:    */s/ Kalpana Srinivasan*
                                                       Kalpana Srinivasan
8                                               Attorneys for Plaintiff
                                                META PLATFORMS, INC.
9

10                                              Jessica Romero
                                                Stacy Chen
11                                              Bridget Anne Freeman
                                                Olivia Gonzalez
12                                              PLATFORM ENFORCEMENT AND
                                                LITIGATION
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# EXHIBIT A

# Social Data Support Center

🔍 Search for a topic or question...

Support › General › What products do you offer?

Contact Us

# What products do you offer?

Social Data is an AI-driven analytics platform that offers in-depth insights into the demographics and psychographics of influencers and their audiences on **Instagram, YouTube and TikTok**.

We are pleased to offer the following products:

1) Audience Data - offers demographics, psychographics and performance insights into the accounts 76,970,634 Instagram, 5.5 million TikTok and 3.9 million YouTube influencers: https://socialdata.hk/audience-data

2) Influencer Identification - helps you find the most relevant talent for your campaign based on the parameters of both influencers and their audiences; there are 91,750,335 Instagram, 5.5 million TikTok and 3.9 million YouTube influencers to choose from: https://socialdata.hk/search?platform=instagram&sort=engagements

3) Post Analytics - allows you to generate reports on a post level to analyse your own or your competitors' campaigns: https://socialdata.hk/post-analytics

4) Sponsored Posts - help you identify sponsored posts on Instagram based on the #hashtags or @mentions they contain or their sponsor; you can find all the sponsored posts for any given location over any time period: https://socialdata.hk/sponsored-posts?created_at=03.20.2020,03.27.2020&likes=1000,null.

## Browse by Topic

- General
- Audience Data

- Post Analytics
- Sponsored Posts Tool

- Pricing/Payment

## Still need help?

Contact Us

URL: https://help.socialdata.hk/articles/9891-what-products-do-you-offer

# EXHIBIT B



公 司 註 冊 處
**COMPANIES REGISTRY**

編號   2868591
**No.**

公 司 註 冊 證 明 書
# CERTIFICATE OF INCORPORATION

———————— \* \* \* ————————

本 人 謹 此 證 明
**I hereby certify that**

Social Data Trading Limited

於 本 日 根 據 香 港 法 例 第 622 章《 公 司 條 例 》
**is this day incorporated in Hong Kong under the Companies Ordinance**

在 香 港 成 立 為 法 團 ， 此 公 司 是 一 間
**(Chapter 622 of the Laws of Hong Kong), and that this company is**

有 限 公 司 。
**a limited company.**

本 證 明 書 於 二 〇 一 九 年 八 月 三 十 日 發 出 。
**Issued on**  30 August 2019 .

.........................................................

香港特別行政區公司註冊處處長鍾麗玲
Ms Ada L L CHUNG
***Registrar of Companies***
***Hong Kong Special Administrative Region***

註 Note：

公司名稱獲公司註冊處註冊，並不表示獲授予該公司名稱或其任何部分的商標權或任何
其他知識產權。

Registration of a company name with the Companies Registry does not confer any trade mark rights
or any other intellectual property rights in respect of the company name or any part thereof.

# EXHIBIT C

2021-10-11 Screenshot from riskiq.com



URL: https://community.riskiq.com/search/socialdata.hk/whois

# EXHIBIT D

## INDEMNITY AGREEMENT

BETWEEN

**I, Mariska Supra, Passport No.A09014925** (Copy attached hereto), residing at 18 Anaboom Crescent, Melodie, Hartbeespoort, South Africa(Proof of Address attached hereto) (Hereinafter referred to as **"the Acting Director"**)

And

**Aleksei Poliakov, Russian Passport No. 75 9435669** (Copy attached hereto), residing at Apt. 104, H. 25, Borovskoe highway, Moscow, Russia (Proof of Address attached hereto) (Hereinafter referred to as **"the Beneficial Owner"**)

The Beneficial Owner has appointed the Acting Director to act as Director **only** of **Social Data Trading Limited** (Hereinafter referred to as **"the Company"**) having its registered office at 7F, MW Tower, 111 Bonham Strand, Sheung Wan, Hong Kong. The Acting Director, in this capacity will perform all corporate acts and actions as may be authorised by the Beneficial Owner from time to time.  It is agreed herewith that the Acting Director will act as Director of the Company as specifically instructed by the Beneficial Owner and not on his own account.

The Beneficial Owner of the Company hereby indemnifies the Acting Director(on a full indemnity basis) against all liabilities, obligations, losses, damages, penalties, actions, proceedings, claims, judgments, demands, costs, expenses or disbursements of any kind (including legal fees and expenses) that the company may incur.

The Beneficial Owner hereby declares and confirms that the Company will not be engaged in any of the following activities: money laundering, receiving the proceeds of drug trafficking, receiving the proceeds of criminal activities, terrorist activities, any other illegal activity and will not use the Company in any manner whatsoever that may damage the good reputation of the Company and/or representatives (Acting Director).

The Acting Director will only act upon written instructions received from the Beneficial Owner or by the Client when properly authorised by the Beneficial Owner.

This Agreement shall continue in force for an unlimited period of time.

Signed on this 20th day of March 2021.

Mariska Supra
**The Acting Director**

Name: Aleksei Poliakov
**The Beneficial Owner**

Witness to the signature of the Acting Director
Name: _Helen Taljaard_

# EXHIBIT E

## AGREEMENT FOR THE PROVISION OF DIRECTOR SERVICES

This agreement is made between Mrs. Mariska Supra, date of birth – 04 NOV 1992, hereinafter referred to as the "Director" and Mr. Aleksei Poliakov, date of birth 22 DEC 1979, the Beneficial Owner of Social Data Trading Limited, hereinafter referred to as the "Beneficiary".

The aforesaid is the Benefiary of the existing Business Company Social Data Trading Limited, a company incorporated in Hong Kong, certificate of incorporation No. 2868591, registered at 7F, MW Tower, 111 Bonham Strand, Sheung Wan, Hong Kong, (hereinafter referred to as the "Company").

1) The Beneficiary has appointed the Director to act as Director of the Company and in this capacity perform all corporate acts and actions as may be authorised by the Beneficiary from time to time. It is agreed herewith that the Director will act as Director of the Company as specifically instructed by the Beneficiaries and not on his own account. The Beneficiary undertakes to make prompt payment when due of all fees and expenses payable to Director in respect of such services which will be agreed from year to year.

2) The Beneficiary hereby declares and confirms that the Company will not be engaged in any of the following activities: money laundering, receiving the proceeds of drug trafficking, receiving the proceeds of criminal activities, terrorist activities, any other illegal activity, and will not use the Company in any manner whatsoever that may damage the good reputation of the Company and/or representatives (Director).

3) It is further agreed herewith that the Director has no direct or beneficial interest in the Company.

4) The Director will only act as requested or notified by the Beneficiary solely upon written instructions which should be given in conformity with the laws of the United Kingdom or any other countries in which the Company is conducting business activities or any other place having jurisdiction over the Company or where such directions are to be carried out or which would arise any liability of Company. Written instructions may be given by Beneficiary or any other persons properly authorized by the Beneficiary to Director by resolution with the signature of the Beneficiary and Director may act on that on behalf of the Beneficiary which undertakes to ratify all steps taken by Director in execution of their instructions. The Director of the Company is authorized to act on the signatories of the beneficiaries without proof of the signatures of the beneficiaries and the director shall be discharged from liabilities to the beneficiaries and the company when acting accordingly.

The Beneficiary undertakes the responsibility to give any information which will be asked by the Director. The Beneficiary may transfer signed written resolutions to the Director via (please choose the desired option and specify details):

a) Courier _____

b) Fax _____

c) Email (scanned copy) _____

5) The Beneficiary hereby declares and confirms that the obligations contained in the present Agreement shall be binding on respective executors, administrators and successors in title.

6) This Agreement may be rescinded at any time by the Beneficiary and in this case the Director shall within five days perform all necessary actions and sign all necessary documents in order to:

a) appoint the person specified by the Beneficiary as the new Director of the Company;

b) resign as the Director of the Company.

7)    This Agreement may be rescinded by the Director in the event the Company fails to comply with Clause 2 above without reasonable excuse the Director may take the necessary actions to resign from their posts.

This Agreement shall be governed, construed and exercised in accordance with the laws of the United Kingdom.

Signed and Agreed by the Beneficiary:

_____Date 20th day of March 2020
**Mr. Aleksei Poliakov**


Signed and Agreed by the Director:

_____Date 20th day of March 2020
**Mrs. Mariska Supra**

# EXHIBIT F

存案 Filed



公司註冊處
**Companies Registry**

法團成立表格
**(股份有限公司)**
**Incorporation Form**
**(Company Limited by Shares)**

公司編號 CR No.
**2868591**

表格
Form **NNC1**

註 Note

**1 建議採用的公司名稱 Proposed Company Name**

建議採用的公司英文名稱 Proposed English Company Name

Social Data Trading Limited

建議採用的公司中文名稱 Proposed Chinese Company Name

**2 公司類別 Type of Company**

請在適用的空格內加上 ✓ 號 Please tick the relevant box

[✓] 私人 Private          [ ] 公眾 Public

**3 公司在香港的註冊辦事處的建議地址**
**Proposed Address of the Company's Registered Office in Hong Kong**

Unit 1503, 15/F,

No. 69 Jervois Street,

Sheung Wan,

香港／Hong Kong

*(本處不接納「轉交」地址或郵政信箱號碼 'Care of' addresses or post office box numbers are not acceptable)*

**4 電郵地址 Email Address**

info@westuniongroup.hk

提交人資料 **Presentor's Reference**

姓名 Name:   WEST UNION GLOBAL LIMITED
地址 Address: Unit 1503, 15/F, No.69 Jervois Street,
Sheung Wan, Hong Kong

電話 Tel: 2891 0030   傳真 Fax: 2891 0095
電郵 Email:info@westuniongroup.hk
檔號 Reference:

請勿填寫本欄 **For Official Use**

23101690222
NNC1
26/08/2019

0132

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

表格
Form **NNC1**

**⑫ 5   公司組成時的股本及最初的股份持有情況**
**Share Capital and Initial Shareholdings on the Company's Formation**

| 股份的類別<br>(如普通股／優先股等)<br>Class of Shares<br>(e.g. Ordinary ／<br>Preference etc.) | 建議發行的<br>股份總數<br>Total Number of<br>Shares Proposed<br>to be Issued | 貨幣<br>Currency | 創辦成員認購的<br>股本總額<br>Total Amount of<br>Share Capital to be<br>Subscribed by<br>Founder Members<br>(a) | 建議發行的股份的<br>將要繳付或視為<br>已繳付的總款額<br>Total Amount to be<br>Paid Up or to be<br>Regarded as Paid Up<br>on the Shares<br>Proposed to be Issued<br>(b) | 建議發行的股份的<br>尚未繳付或視為<br>尚未繳付的總款額<br>Total Amount to<br>Remain Unpaid or to<br>be Regarded as<br>Unpaid on the Shares<br>Proposed to be Issued<br>(a) − (b) |
|---|---|---|---|---|---|
| Ordinary | -10,000- | HKD | HKD 10,000.00 | HKD 10,000.00 | HKD 0 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| 總值 Total | -10,000- |  |  |  |  |
|  |  | HKD | HKD 10,000.00 | HKD 10,000.00 | HKD 0 |

**⑬ 5A   股份所附帶的權利的詳情 Particulars of Rights Attached to Shares**
*(只適用於發行超過一類股份的公司 Only applicable to company issuing more than 1 class of shares)*

| 股份的類別<br>(如普通股／<br>優先股等)<br>Class of Shares<br>(e.g. Ordinary ／<br>Preference etc.) | 附帶的權利的詳情<br>(包括表決權；在分派股息時參與該項分派的權利；<br>在分派股本時參與該項分派的權利；該類別股份是否屬可贖回股份等)<br>Particulars of Rights Attached<br>(Including voting rights; rights to participate in a distribution as respects dividends;<br>rights to participate in a distribution as respects capital; whether the shares are redeemable etc.) |
|---|---|
|  |  |

D133

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

表格
Form **NNC1**

**14**  6  創辦成員 **Founder Members**
(如超過兩名創辦成員，請用續頁 A 填報 Use Continuation Sheet A if more than 2 founder members)

1  中文姓名／名稱
Name in Chinese

英文姓名／名稱
Name in English

CAROL JOUBERT

地址
Address

2 Dr Kolbe Avenue, Meerhof,

Hartbeespoort 0216,

國家／地區
Country／Region

Republic of South Africa

| 認購的股本<br>Share Capital to be<br>Subscribed | 股份的類別<br>(如普通股／優先股等)<br>Class of Shares<br>(e.g. Ordinary／Preference etc.) | 建議向該成員發行的股份數目<br>Shares Proposed to be Issued to the Member | | |
|---|---|---|---|---|
| | | 總數<br>Total Number | 貨幣<br>Currency | 總款額<br>Total Amount |
| | Ordinary | -10,000- | HKD | HKD10,000 |
| | | | | |
| | 總值 Total | -10,000- | HKD | HKD10,000 |

2  中文姓名／名稱
Name in Chinese

英文姓名／名稱
Name in English

地址
Address

國家／地區
Country／Region

| 認購的股本<br>Share Capital to be<br>Subscribed | 股份的類別<br>(如普通股／優先股等)<br>Class of Shares<br>(e.g. Ordinary／Preference etc.) | 建議向該成員發行的股份數目<br>Shares Proposed to be Issued to the Member | | |
|---|---|---|---|---|
| | | 總數<br>Total Number | 貨幣<br>Currency | 總款額<br>Total Amount |
| | | | | |
| | | | | |
| | 總值 Total | | | |

0134

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

表格
Form **NNC1**

**⑮ 7    首任公司秘書 First Company Secretary**
*(如超過一名公司秘書應用自然人或法人團體，請用續頁 B 填報 Use Continuation Sheet B if more than 1 company secretary is a natural person or a body corporate)*

**A.    公司秘書(自然人) Company Secretary (Natural Person)**

| | |
|---|---|
| 中文姓名<br>Name in Chinese | |

英文姓名 **Name in English**

| | |
|---|---|
| 姓氏<br>Surname | |

| | |
|---|---|
| 名字<br>Other Names | |

| 前用姓名<br>Previous Names | | |
|---|---|---|
| | 中文 Chinese | 英文 English |

| 別名<br>Alias | | |
|---|---|---|
| | 中文 Chinese | 英文 English |

**⑯    香港通訊地址 Hong Kong Correspondence Address**

| |
|---|
| |
| |
| |
| 香港／HONG KONG |

*(本處不接納郵政信箱號碼 Post office box numbers are not acceptable)*

**⑰    電郵地址 Email Address**

| |
|---|
| |

**⑱    身分證明 Identification**

(a)    香港身分證號碼
Hong Kong Identity Card Number

| | | | | | | ( ) |
|---|---|---|---|---|---|---|

(b)    護照
Passport

| | |
|---|---|
| 簽發國家 Issuing Country | 號碼 Number |

**⑳ B.    公司秘書(法人團體) Company Secretary (Body Corporate)**

| | |
|---|---|
| 中文名稱<br>Name in Chinese | |

| | |
|---|---|
| 英文名稱<br>Name in English | WEST UNION GLOBAL LIMITED |

**⑲    香港地址 Hong Kong Address**

| |
|---|
| Unit 1503, 15/F, |
| No.69 Jervois Street, |
| Sheung Wan, |
| Hong Kong |

*(本處不接納「轉交」地址或郵政信箱號碼 'Care of' addresses or post office box numbers are not acceptable)*

**⑰    電郵地址 Email Address**

| |
|---|
| info@westuniongroup.hk |

公司編號 Company Number

| | |
|---|---|
| 2486742 | 0135 |

表格
**Form NNC1**

**⑮ 8   首任董事 First Directors**

**A.   董事(自然人) Director (Natural Person)**
*(如超過一名董事屬自然人，請用續頁 C 填報 Use Continuation Sheet C if more than 1 director is a natural person)*

| 中文姓名<br>Name in Chinese | |
|---|---|

**英文姓名 Name in English**

| 姓氏<br>Surname | JOUBERT |
|---|---|

| 名字<br>Other Names | CAROL |
|---|---|

| 前用姓名<br>Previous Names | | |
|---|---|---|
| | 中文 Chinese | 英文 English |

| 別名<br>Alias | | |
|---|---|---|
| | 中文 Chinese | 英文 English |

**㉑ 住址 Residential Address**

| 2 Dr Kolbe Avenue, Meerhof, |
|---|
| Hartbeespoort 0216, |
| |

| 國家／地區<br>Country / Region | Republic of South Africa |
|---|---|

*(本處不接納「轉交」地址或郵政信箱號碼 'Care of' addresses or post office box numbers are not acceptable)*

**㉒ 電郵地址 Email Address**

| NA |
|---|

**㉓ 身分證明 Identification**

(a) 香港身分證號碼
Hong Kong Identity Card Number

| | | | | | | | ( ) |
|---|---|---|---|---|---|---|---|

(b) 護照
Passport

| Republic of South Africa | A02689343 |
|---|---|
| 簽發國家 Issuing Country | 號碼 Number |

**㉕**

| **提示 Advisory Note** |
|---|
| 所有公司董事均應閱讀公司註冊處編製的《董事責任指引》，並熟悉該指引所概述的董事一般責任。<br>All directors of the company are advised to read 'A Guide on Directors' Duties' published by the Companies Registry and acquaint themselves with the general duties of directors outlined in the Guide. |

**㉖ 出任董事職位同意書 Consent to Act as Director**
*請在適用的空格內加上 ✓ 號 Please tick the relevant box*

[✓] 本人同意在公司成立為法團時擔任其首任董事，並確認本人已年滿 18 歲。
I consent to be a director of the company on its incorporation and confirm that I have attained the age of 18 years.

簽署 Signed _____

[ ] 出任董事職位同意書會於公司成立為法團的日期後 15 日內交付登記。
The Consent to Act as Director will be delivered for registration not later than 15 days after the date of incorporation of the company.

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

表格
Form **NNC1**

8   首任董事 First Directors  (續上頁 cont'd)

B.   董事 (法人團體) Director (Body Corporate)
(如超過一名董事屬法人團體,請用續頁 D 填報 Use Continuation Sheet D if more than 1 director is a body corporate)

中文名稱
Name in Chinese

英文名稱
Name in English

**(24)** 地址
Address

國家／地區
Country／Region
(本處不接納「轉交」地址或郵政信箱號碼 'Care of' addresses or post office box numbers are not acceptable)

**(22)** 電郵地址
Email Address

公司編號 Company Number
(只適用於在香港註冊的法人團體 Only applicable to body corporate registered in Hong Kong)

**(25)**

| 提示 Advisory Note |
|---|
| 所有公司董事均應閱讀公司註冊處編製的《董事責任指引》,並熟悉該指引所概述的董事一般責任。 All directors of the company are advised to read 'A Guide on Directors' Duties' published by the Companies Registry and acquaint themselves with the general duties of directors outlined in the Guide. |

**(26)** 出任董事職位同意書 Consent to Act as Director
請在適用的空格內加上 ✓ 號 Please tick the relevant box

☐ 本人獲上述法人團體授權確認上述法人團體同意在公司成立為法團時擔任其董事。
I, being authorized by the above body corporate, confirm that the body corporate consents to be a director of this company on its incorporation.

簽署 Signed : _____
法人團體的董事／公司秘書／獲授權人士*
Director／Company Secretary／Authorized Person of the Body Corporate*

☐ 出任董事職位同意書會於公司成立為法團的日期後 15 日內交付登記。
The Consent to Act as Director will be delivered for registration not later than 15 days after the date of incorporation of the company.

*請刪去不適用者 Delete whichever does not apply

0137

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

表格
Form **NNC1**

**❼ 9    創辦成員陳述書 Statement of Founder Member**

本人現核證 **I certify that:**

(a)  本人為公司的創辦成員或獲其授權人士(如創辦成員為法人團體)並獲其他創辦成員(如有的話)授權簽署本表格。
I am a founder member of this company or an authorized person of a founder member, which is a body corporate (if applicable) and am authorized by the other founder members (if any) to sign this incorporation form.

(b)  名列本表格內的每一名屬自然人的公司秘書通常居於香港。
Each of the company secretaries named in this form who is a natural person ordinarily resides in Hong Kong.

(c)  名列本表格內但未簽署「出任董事職位同意書」的每一名董事已同意在公司成立為法團時擔任其董事,每一名屬自然人的董事並且已年滿 18 歲。
Each of the directors named in this form who has not signed the 'Consent to Act as Director' has consented to be a director of this company on its incorporation and each director who is a natural person has attained the age of 18 years.

(d)  所有創辦成員已為《公司條例》第 67(1)(a) 條的目的而簽署公司的章程細則,並確認連同本表格交付的公司章程細則的文本的內容,與由所有創辦成員簽署的該等章程細則的內容相同。
The company's articles have been signed by all founder members for the purposes of section 67(1)(a) of the Companies Ordinance.  The contents of the copy of the company's articles delivered together with this form are the same as those of the articles signed by all founder members.

(e)  本表格所載的資料、陳述及詳情均屬準確,並與公司的章程細則內的資料、陳述及詳情相符。
The information, statements and particulars contained in this form are accurate and consistent with those contained in the company's articles.

(f)  公司已遵守《公司條例》中就有關公司註冊的所有規定。
All the requirements of the Companies Ordinance in respect of the registration of the company have been complied with.

本表格包括下列續頁 **This Form includes the following Continuation Sheet(s)**

| 續頁 Continuation Sheet(s) | A | B | C | D |
|---|---|---|---|---|
| 頁數 Number of pages | 0 | 0 | 0 | 0 |



**❼ 簽署  Signed:**

姓名 Name ： CAROL JOUBERT          日期 Date ：          20-08-2019
　　　　　　創辦成員 Founder Member                        日 DD ／ 月 MM ／ 年 YYYY

0138

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

# EXHIBIT G

# Services Agreement
## (ONLY VALID with DPA)

This agreement together with the data processing addendum (DPA) forms a **Services Agreement** and is offered to you by Social Data Trading Limited with registered office at 7F, MW Tower, 111 Bonham Strand, Sheung Wan, Hong Kong (**Social Data** or **we**) and applies to the **Customer** (or **you**) with respect to your access to and use of Services (as defined below) we make available through http://socialdata.hk/ (referred to collectively as the "Site").

### 1.   Definitions

1.1.  **API Guide** - information available at  *https://socialdata.hk/docs/api#section/Introduction*

1.2.  **Influencers** means natural or legal persons that have a presence on the Internet having in excess of a certain amount followers (decided by you) on various social media platforms.

1.3.  **Scraping** means web scraping or screen scraping or content scraping and involves an act of obtaining information contained on websites through automated means. Same information may be obtained manually, but through automation, the speed and amount of obtained data is incomparably bigger. Web scraping can also be done manually by any Internet user, via the function of copy-pasting.

1.4.  **Service or Services** means provision of information on Influencers through Scraping to you upon your request and instruction to us.

1.5.  **Site or website** means *www.socialdata.hk*

### 2.   Services and Your Use of The Services, License

2.1.  We offer a web scraping service (with different types of payment methods and options) to help you find and get in touch with Influencers that suit your business needs (or those of your clients) most pertinently.

2.2.  Any descriptions or illustrations on our site prior to your log in or sign up are published for the sole purpose of giving a general idea of the services described in them. They will not form part of the Agreement or have any contractual force.

2.3.  We warrant to you that the Services will be provided using reasonable care and skill. We will use all reasonable endeavours to meet any performance dates agreed with you, but any such dates are estimates only and failure to perform the Services by such dates will not give you the right to terminate the Agreement.

2.4.  Social Data grants to you a limited, non-exclusive, non-transferable, personal and non-assignable license and right  to access and use the Site, and to all data, materials, information or other outputs from the Site as well as a result of Services (in a form of pdf documents or other literary works) during the Term of this Agreement.

### 3.   Provision Of The Services

3.1.  You understand and agree that Social Data may modify, terminate, suspend, or otherwise adjust any and all aspects of the Services at any time without prior notice to you.

3.2.  You acknowledge and agree that Social Data can disable access to Services for non-payment or other material breach of the Terms, you may be prevented from accessing your files or other content which is contained in Social Data Site or Services. You will not be due a refund should the suspension and/or termination of the Agreement be caused by your breach of this Agreement.

3.3.  You acknowledge and agree that you are allowed to use only single account per person. In case of legal person you are allowed to use single account for multiple employees.

### 4.   Security

As part of the registration process, you may be required to provide certain information. You agree that any registration information you give to Social Data will always be accurate, correct and up to date. You are responsible for protecting any tokens, keys or passwords for Social Data Site and Services from unauthorized access. You will be held responsible for any activity that occurs under your tokens, keys or passwords. You agree to notify Social Data immediately of any unauthorized use of your tokens, keys, passwords or any other breach of security. Social Data may access your tokens, keys, passwords from time to time to provide You with assistance on technical or billing issues or in order to maintain or improve the Services.

### 5.   Data Processing Addendum (DPA)

5.1.  The DPA forms part of this Agreement and lays out our relationship with you when dealing with personal data of Influencers. This Agreement is **ONLY VALID** with the DPA.

5.2.  You acknowledge that certain obligations arise in relation to you processing personal data of Influencers that you receive from us through Services. You warrant that you will comply with the DPA and relevant laws applicable to your situation as the controller of personal data. Those may include, among others, and depending on the applicable laws, an obligation to:

5.2.1. Notify Influencers of the fact that you are processing their personal data (at a minimum those Influencers whom you establish contact with at the time of first contact);

5.2.2. Notify Influencers the source where you obtained Influencer personal data;

5.2.3. Notify Influencers of their rights (right of deletion, provision of information and similar);

5.2.4. Keep personal data of Influencers up to date and delete outdated personal data or that personal data that you are not intending to use;

5.2.5. Keep personal data of Influencers secure in order to prevent unauthorized access or loss.

5.2.6. Register with relevant authorities, if required.

5.3. Those obligations arise independently of our relationship with you, solely based on the fact that you would become the controller of personal data of Influencers. Social Data is not in a position to remove this obligation through any contractual means.

5.4. Our Services are limited to the provision of Influencer information to you for the establishment of contact and in the promotion of a business. What you do with that information after receipt is purely a matter of your business needs. While we cannot insist on how you process personal data you obtain through our Services compliance with the data protection laws is in your interest as the controller of that personal data, in order to avoid regulatory penalties and damage to the reputation.

5.5. Services are provided to you solely upon your request and instruction. You tell us your needs, we find relevant Influencers for you to get in touch with.

5.6. For instance, if you order information on five Influencers from Singapore with 10,000 followers, whose interests span sports, travelling, healthy eating with a 10% and above engagement rate for a post – we, as data processors, will try to find information on such Influencers to you and submit them as part of Services. You would then be under an obligation to treat that information in accordance with the relevant data protection laws of both the Influencers as well as your country of incorporation. We are not in a position to eliminate the need for your compliance with the data protection laws.

5.7. On our part, we warrant to comply with relevant data protection laws in cases where we are regarded an independent controller of that personal data.

## 6. Charged Services

6.1. Certain features of the Site or the Services are associated with charges or fees ("Charged Services").

6.2. For use of Services you may purchase access to various plans, some of which are listed below for illustrative purposes and will be specified in the invoice to you:

6.2.1. Tokens;
6.2.2. Subscription for:
    6.2.2.1.    Monthly tokens;
    6.2.2.2.    Audience Data;
    6.2.2.3.    Influencer Identification
    6.2.2.4.    Post Analytics
    6.2.2.5.    Sponsored Posts

6.3. All charges and fees are listed in US Dollars unless expressly identified otherwise. You agree to pay any applicable charges and fees associated with your use of the Services. Pricing is flexible and subject to change at any time. We do not guarantee that the pricing will remain the same throughout the validity of this Service Agreement. Should, however, the pricing change, you will have a chance to cancel your subscription without further obligation of either party towards the other.

6.4. In order to access Charged Services, you may purchase predefined set of tokens on pay as you go basis ("**Tokens**"). In this case you may pay for access to Charged Services with such Tokens. Tokens are valid for 6-month periods and expire after the end of such period. If not used by then, Tokens lose their validity and you are not due a refund. Should you, however, purchase additional Tokens within

30 days of the expiry of the previous batch, we will, as a gesture of good will, reinstate the expired Tokens.

6.5. To access the parts of the Services that are associated with charges and fees, you must provide requested details and follow applicable billing procedures. Billing procedures are subject to change at any time without prior notice to you. By providing a payment method, you represent that you are authorized to use the payment method you provided and that the information provided by you is true and accurate. Social Data accounts can be billed in advance on a monthly basis and are non-refundable. There will be no refunds or credits for partial use of Service, upgrade/downgrade refunds, refunds for unused features, or refunds for failures or inaccessibility of Service due to circumstances beyond Social Data control. In order to treat everyone equally, no exceptions will be made. Downgrading your Service may cause the loss of content, features. Social Data does not accept any liability for such loss. Social Data reserves the right to suspend or terminate your access to the Services for nonpayment. If your Subscription is terminated for any reason, you are still liable for a remaining unpaid period of your Subscription if your Subscription is purchased on monthly basis. Social Data may recover such payments due and in that case you will bear all the expenses related to such recovery or/and debt collection.

6.5.1. Particulars of charges would be listed in the invoice to you.

6.5.2. Any Subscription auto renews on a monthly rolling basis unless 30 days' notice of cancellation is provided to expire on the last day of a renewal period.

6.5.3. For avoidance of doubt, and among others, unless specified otherwise, you are limited to:

     6.5.3.1.    5000 search requests per month under Influencer Identification plan;
     6.5.3.2.    5 requests to Site per second;
     6.5.3.3.    1 account per person;
     6.5.3.4.    10 requests to API per second

## 7.  Content

7.1. You understand and acknowledge that such data/content may not be exhaustive and the analysis of the data/content is based on what third-party data sources provide to Social Data. The data/content is based on publicly available data/content and Social Data does not verify the accuracy of data/content provided by such third parties. In addition, the data/content collected and displayed may require access to third party sites and such third parties may prevent Social Data from generating such data/content. We, therefore, do not warrant that the data points or subscription type would remain the same throughout the validity of this Service Agreement. Those data points are subject to change but do not entitle you to a refund of any fees or charges paid.

7.2. Furthermore, government regulations and/or compliance with applicable laws may prevent Social Data from using certain data/content or providing it to you. You agree that you shall evaluate and bear all risks associated with the Services, including any reliance on the accuracy, completeness, or integrity of such Services. By using the Site and Services, you represent and warrant that you have such knowledge and experience in financial and business matters that you are capable of evaluating the merits and risks of the information made available in the Site and Services, and make effective use of the Services provided by Social Data as an analytical tool. You acknowledge that the Services are

made available to you without any warranties of any kind. By using the Services you understand and agree that your use of the Services is at your sole discretion and risk.

7.3.  In furtherance of above, you understand that we may have to stop providing a particular type of Subscription depending on the available resources and access to third party platforms. You understand that you will not be due a refund in such a case, subject to our option to refund a pro-rata amount of the unused Subscription period.

7.4.   The Site may contain links to other sites on the Internet which are owned and operated by Third Party Vendors and other third parties (the "External Sites"). You acknowledge that Social Data is not responsible for the availability of, or the materials located on or through, any External Sites.

**8.   General restrictions on use of Services and restrictions on use of literary works obtained as a result thereof**

**While it is your right to freely use the information obtained as a result of our Services and contained in pdf documents, you agree that:**

8.1.  you will not reproduce, duplicate, copy, sell, trade or resell the literary works you obtain through Services or our Site for any purpose without our prior permission;

8.2.  you will not obscure, alter, remove or delete any copyright or other proprietary notices contained in the literary works arising out of Services;

8.3.  you will not copy, modify, adapt, translate or otherwise create derivative works of any of the literary works (documents in pdf or otherwise) obtained from the Site;

8.4.  you warrant that you will not attempt or assist others to attempt or actually reverse engineer, decompile, disassemble or otherwise attempt to discover the source code of any software we may give you access to.

8.5.  Use the Services in any way that harms Social Data, its affiliates, resellers, distributors, customers, service providers and/or suppliers, as determined by Social Data in its sole reasonable discretion;

8.6.  Use the Services in any manner that could damage, disable, overburden, or otherwise harm the Site or interfere with any other party's use and enjoyment of the Services and/or Site;

8.7.  Use any meta tags or any other "hidden text" utilizing Social Data's name or trademarks without the prior written consent of Social Data;

8.8.  Display the Site in frames or utilize any other techniques to display the Site (or any content on the Site) without the prior written consent of Social Data;

8.9.  Use the Services in any manner which is contrary to the provisions of any applicable third party terms of use or other agreements (including any requirement to secure written permission prior to making certain utilization of content);

8.10.  Use the Services to "stalk" or otherwise harass another, or in breach of any applicable laws;

8.11.  Employ any technique to compile any false or misleading information or content;

8.12.  Harm minors in any way;

8.13.  Intentionally or unintentionally violate any applicable local, state, national or international law, including, but not limited to, regulations promulgated by the U.S. Securities and Exchange Commission, any rules of any national or other securities exchange, including, without limitation, the New York Stock Exchange, the American Stock Exchange or the NASDAQ, and any regulations having the force of law;

8.14.  Use the Services in any manner that violates or infringes the rights of any third parties, including without limitation copyright, trademark, patent publicity, or other proprietary rights;

8.15.  Use the Social Data domain name or other contact information as a pseudonymous reply email, postal, and/or fax address (or any other type of return address) for any communication transmitted from another location or through another service or otherwise impersonate Social Data or any other third party;

8.16.  Create multiple tokens, keys or passwords for disruptive or abusive purposes, or with overlapping use cases. Mass tokens, keys or passwords creation may result in suspension of all related tokens, keys or passwords.

8.17.  any breach of these terms is cause for permanent suspension of all tokens, keys or passwords without any refund due thereof.

8.18.  Access to Services is and will be limited to certain whitelisted IP addresses, as provided by you in advance or using the basic auth upon your advance request (subject to our approval). For further instruction you should check the API Guide.

8.19.  Other restrictions may be listed in the particular invoice and such terms take precedence over any other term between us. Payment of the invoice would signify acceptance of such additional terms and restrictions.

8.20.  It is a condition of this agreement that you will not exceed or breach any restrictions listed herein and in the API Guide. Any such breach, whether intentional or unintentional shall be repudiatory and entitle us to cancel  your subscription and terminate the Service Agreement without further obligation to you.

8.21.  YOU ACKNOWLEDGE AND AGREE THAT IN CASE WE DETECT MULTIPLE ACCOUNTS OR/AND PROMOTION PLANS ESTABLISHED FOR ONE PERSON, WE AT OUR SOLE DISCRETION MAY, WITHOUT WARNING AND REFUND, TERMINATE SUCH MULTIPLE ACCOUNTS OR/AND PROMOTION PLANS.

8.22.  Neither party is allowed to link, use or refer to the other by name on the Internet or in any other media (newspapers, radio, TV and similar) as well as never disclose the nature of the other's business, unless such information is already public knowledge.

## 9. Confidentiality

9.1. Each party undertakes to keep the other party's confidential information confidential and shall not use or disclose such confidential information except for the purpose of exercising or performing its rights and obligations under this Agreement.

9.2. Each party may disclose the other party's confidential information to its employees, officers, representatives or advisers who need to know such information for the purposes of carrying out the party's obligations under this Agreement and who are legally obligated to maintain its confidentiality, and as may be required by law, court order or any governmental or regulatory authority.

9.3. For the purposes of this Agreement, confidential information means all information, concerning one another's business, affairs, customers, clients or suppliers including the content of this Agreement, designated as confidential or which ought reasonably to be considered confidential. For instance, any information that is not public knowledge and You obtained access to solely through Services is confidential information and You shall not use nor disclose it without Social Data's written consent.

## 10. Term; Cancellation Or Termination

10.1.        Term.  This Agreement is effective on the date of your acceptance and terminates **one year** thereafter, unless extended by parties in advance.

10.2.        Termination for Cause.  Should either party default in the performance of this Agreement or materially breach any of its obligations under this Agreement, the non-breaching party may terminate this Agreement immediately if the breaching party fails to cure the breach within 10 business days after having received written notice by the non-breaching party of the breach or default.

10.3.        Termination for Convenience. You may cancel the Services at any time, with or without cause. However, You understand and accept that by cancelling the Services:

   10.3.1.   you will not receive a refund;
   10.3.2.   you are obligated to pay all charges due until the end of the subscription – early termination would cause us loss of expected profit from this Agreement with you;
   10.3.3.   you would lose access to and use of your tokens, keys or passwords and any Services and Services credits contained therein.

10.4.        Upon termination or expiration of this Agreement for any reason, all licensed rights granted in this Agreement to you will immediately cease to exist and are revoked. Sections 2, 3, 4, 7 to 11, and 12 to 15, as well as your obligation to pay any fees applicable, will survive any expiration or termination of this Agreement for any reason.

## 11. Proprietary Rights

11.1.        You acknowledge and agree that the Site and Services are the exclusive property of Social Data and except as may be otherwise provided herein, Social Data does not grant any express or implied right in them to you. Social Data owns the copyright for the Site as a compilation, and all Services accessible from the Site. All content included on the Site, such as text, graphics, logos, button

icons, images, data compilations, and software, is the property of Social Data or its content suppliers and protected by international copyright laws. Any third party marks displayed on the Site and/or Services are the property of their respective owners. You further acknowledge that the Services may contain information which is designated confidential and that you shall not disclose such information without Social Data's prior written consent.

## 12. Notices

12.1.    When we refer to "in writing" in these Terms, this includes email.

12.2.    Any notice or other communication given under or in connection with this Agreement must be in writing and be delivered personally, sent by pre-paid first class post or other next working day delivery service, or email.

12.3.    A notice or other communication is deemed to have been received:

12.3.1.  if delivered personally, on signature of a delivery receipt;

12.3.2.  if sent by email, the next working day after transmission, subject to failed delivery notice.

12.3.3.  In proving the service of any notice, it will be sufficient to prove, in the case of a letter, that such letter was properly addressed, stamped and placed in the post and, in the case of an email, that such email was sent to the specified email address of the addressee.

12.4.    The provisions of this clause will not apply to the service of any proceedings or other documents in any legal action.

12.5.    Social Data email for notice purposes: ***info@socialdata.hk***

12.6.    Customer email for notice purposes shall be the one which was used to log into the system. If the Customer wishes to use another email, it shall notify Social Data in advance.

## 13. Warranties

13.1.    Social Data represents and warrants that at all times during the Term of this Agreement:

13.1.1.1.    it will comply with all applicable laws, rules, regulations, and guidelines;

13.1.1.2.    it is the owner of the Services or otherwise has the right to grant you the rights and license set forth in this Agreement and the Services will not infringe the intellectual property rights of any third party;

13.1.1.3.    the Services will be provided by qualified personnel in a professional and skillful manner;

13.1.1.4.    it will not, and will not allow the Services to, introduce into Customer software or systems any viruses, worms, time bombs, corrupted files, Trojan horses or other harmful or malicious code, files, scripts, agents, programs, or any other similar code that may interrupt, limit, damage the operation of Customer's computers or property;

13.2.      Except to the extent set forth above, THE SERVICES ARE PROVIDED WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED. INCLUDING ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE.

13.3.      You warrant that you have had access to, have read and understood all of the information available in the API Guide and will comply with those terms.


### 14. INDEMNIFICTION AND LIMITATION OF LIABILITY

14.1.      **Indemnity.**  Each party will defend, indemnify and hold the other party and its affiliates, employees, officers and agents harmless from and against all claims, damages, liabilities, losses, expenses and costs (including reasonable fees and expenses of attorneys and other professionals) arising out of or resulting from:

14.1.1.  any allegation or action by a third party arising from or related to the Services or their use, or the other party's receipt, possession, reproduction, use or sale thereof, infringes, misappropriates or violates such third party's intellectual property rights;

14.1.2.  any allegation or action that would, if proven, constitute an inaccuracy, untruthfulness, or breach of any representation or warranty made by either party under this Agreement;

14.1.3.  any allegation or action by a third party that is based on a claim that an act or omission of the either party resulted in: (i) personal injury (or death) or tangible or intangible property damage (including loss of use); or (ii) the violation of any statute, ordinance, regulation or other law.

14.2.      Collectively, the matters arising under subsections (a) to (c) are each a "Claim".

14.3.      **Indemnification Procedures.**  As a condition to a party's obligation to indemnify the other party under this Agreement, the indemnified party will: (i) provide the indemnifying party with prompt written notice of any Claim that would give rise to liability of the indemnifying party under this Agreement, provided that failure to give timely notice will not relieve the indemnifying of its obligations to the extent that such failure does not materially prejudice the indemnifying party's ability to defend or settle such Claim; (ii) tender sole control of the defense and settlement of such Claim to the indemnifying party, provided that the indemnifying party will not settle any such Claim without the written consent of the indemnified party; (iii) provide the indemnifying party, at the indemnifying party's expense, with such assistance as the indemnifying party may reasonably request; and (iv) not disclose the terms of any settlement unless required to do so by judicial or other government order, and will not publicize, or permit any third party to publicize, any settlement without the indemnifying party's prior written consent.  Further, the indemnified party may participate in the defense or settlement of a Claim with its own counsel at its expense.

14.4.      **Limitation of Liability.**Except for parties' indemnification obligations in this Agreement and for breach of confidentiality, in no event will either party or an airline be liable for any special, indirect,

incidental or consequential damages or for any damages resulting from loss of use, data or profits, whether in contract, tort, strict liability or otherwise, even if such party has been advised of the possibility of such damages. In no event will either party's liability to the other party for damages in connection with this Agreement, whether in contract, tort or otherwise, exceed, in the aggregate, the amount of fees paid by Customer to Social Data during the 12 months prior to initiation of a claim under dispute resolution section herein.

## 15. Governing Law and Jurisdiction

15.1.      Dispute Resolution. Except for the right of either Party to apply to a court of competent jurisdiction for a temporary restraining order, a preliminary injunction, or other equitable relief to preserve the status quo or prevent irreparable harm, in the event of any other controversy or claim arising out of or relating to this Agreement, or a breach thereof, the parties hereto agree first to try and settle the dispute by mediation, administered by the International Centre for Dispute Resolution under its Mediation Rules. If settlement is not reached within 60 days after service of a written demand for mediation, any unresolved controversy or claim arising out of or relating to this contract shall be settled by arbitration in accordance with the International Arbitration Rules of the International Centre for Dispute Resolution.

15.1.1.  The number of arbitrators shall be one;

15.1.2.  The place of arbitration shall be New York, NY, USA;

15.1.3.  The language of the arbitration shall be English.

15.2.      Each Party shall bear its own expenses, but Parties shall share equally in the expenses of the arbitration tribunal. The Parties agree that all arbitration proceedings conducted pursuant to this Section shall be kept strictly confidential, and all information disclosed in the course of such arbitration proceedings shall be used solely for the purpose of those proceedings. Judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction.

## 16. Miscellaneous

16.1.      Social Data is an independent contractor of Customer, and nothing in this Agreement will be construed as establishing a partnership, joint venture, agency, employment or similar relationship. Social Data does not have any authority to bind Customer by contract or otherwise.

16.2.      If any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement will remain in full force and effect, and the provision affected shall be deemed modified to the extent necessary to allow enforceability of the provision as so limited.  If a deemed modification is not satisfactory to make the provision enforceable, then the unenforceable provision shall be deemed deleted, and the validity and enforceability of the remaining provisions shall not be affected thereby.

16.3.        **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

16.4.        **Amendments and Waivers.**  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.  No online terms or terms associated with any invoice, purchase order, or other document all modify this Agreement.

16.5.        Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.  Social Data may assign any of its rights and obligations under this Agreement.  No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

# EXHIBIT H

2020-09-23 - Screenshot from socialdata.hk



URL: https://help.socialdata.hk/articles/9892-how-have-you-obtained-this-data

# EXHIBIT I

2020-09-23 - Screenshot from socialdata.hk



URL: https://socialdata.hk/audience-data

EXHIBIT J

2020-10-01   Billie Eilish Report



# BILLIE EILISH ✔

@billieeilish

**67M** ▲ 0.43%

Followers

🇺🇸 **Los Angeles**

Location

**13M**

Avg Views

**81K**

Avg Comments

**6.9M** ▲ 4.73%

Avg Likes



## Influencer Details

### Followers ▲ 0.43% this month



### Following ▲ 100% this month



### Likes



### Engagements spread for last posts

♡ Likes   ⌕ Comments



### Engagement Rate **10.39%**



# Influencer Details

## Influencer Interests



👕 Clothes, Shoes, Handbags & Accessories

🎵 Music

🖥 Television & Film

🔲 Electronics & Computers

✳ Cars & Motorbikes

## Popular # and @



#mycalvins   #mytruth   #blacklivesmatter

#justiceforgeorgefloyd   #mcmaw19

@mattyvogel   @blohsh   @tammytaylornails

@nbcsnl   @gettyentertainment   @recordingacademy

## Influencer Brand Affinity

 Apple

— Bershka

iHeartRadio Music Awards

Justin Bieber

Mazda

## Audience Details by Followers

😐 **86.69%**
Followers Credibility

**14.2%**
Notable Followers

**Location by Country**

🇺🇸 United States — 25.03%

🇧🇷 Brazil — 7.11%

🇷🇺 Russia — 6.02%

### Audience Reachability



| | | | |
|---|---|---|---|
| 51.32% | 26.68% | 9.92% | 12.08% |
| <500 Followings | 500-1k Followings | 1-1.5k Followings | >1.5k Followings |

### Age and Gender Split

● Female 70.58%    ● Male 29.42%



| | 13 — 17 | 18 — 24 | 25 — 34 | 35 — 44 | 45 — 64 |
|---|---|---|---|---|---|
| Female | 11.31% | 42.17% | 15.12% | 1.81% | 0.17% |
| Male | 2.29% | 16.03% | 9% | 1.46% | 0.64% |

### Location by City



🇺🇸 New York City — 1.46%

🇷🇺 Moscow — 1.37%

🇧🇷 São Paulo — 1.28%

🇺🇸 Los Angeles — 1.25%

🇬🇧 London — 0.75%

### Audience Brands

| | | |
|---|---|---|
| 🏰 | Walt Disney | 9.44% |
| 🍎 | Apple | 8.27% |
| ☕ | Starbucks | 5.8% |
| ✔ | Nike | 4.22% |
| NETFLIX | Netflix | 3.85% |

### Audience Interests

| | | |
|---|---|---|
| 👥 | Friends, Family & Rel... | 31.33% |
| 🎵 | Music | 27.77% |
| 👕 | Clothes, Shoes, Han... | 26.67% |
| 📷 | Camera & Photograp... | 26.59% |
| 🖥 | Television & Film | 26.02% |

### Audience lookalikes

@finneas
FINNEAS

@iamhalsey
halsey

@blohsh
blöhsh

Case 3:21-cv-09832-GST Document 1 Filed 12/02/21 Page 54 of 83

## Audience Details by Likes

👍 **92.63%**
Likers Crediblity

**17.07%**
Notable Likes

**13.69%**
Likes not from Followers

### Location by Country

| | | |
|---|---|---|
| 🇺🇸 United States | 23.57% |
| 🇷🇺 Russia | 6.59% |
| 🇧🇷 Brazil | 5.49% |

### Audience Reachability

| <500 Followings | 500-1k Followings | 1-1.5k Followings | >1.5k Followings |
|---|---|---|---|
| 58.56% | 28.04% | 7.24% | 6.16% |

### Age and Gender Split

● Female 77.1%  ● Male 22.9%

| 13 — 17 | 18 — 24 | 25 — 34 | 35 — 44 | 45 — 64 |
|---|---|---|---|---|
| 14.1% / 2.11% | 45.57% / 12.94% | 16% / 6.58% | 1.22% / 0.99% | 0.21% / 0.29% |

### Location by City



| | | |
|---|---|---|
| 🇺🇸 Los Angeles | 1.65% |
| 🇷🇺 Moscow | 1.17% |
| 🇺🇸 New York City | 1.15% |
| 🇧🇷 São Paulo | 1% |
| 🇲🇽 Mexico City | 0.9% |

### Audience Brands

| | | |
|---|---|---|
| Walt Disney | 11.44% |
| Starbucks | 7.56% |
| Apple | 6.56% |
| Nike | 4.91% |
| Adidas | 3.95% |

### Audience Interests

| | | |
|---|---|---|
| Friends, Family & Rel… | 32.63% |
| Music | 29.1% |
| Clothes, Shoes, Han… | 27.18% |
| Camera & Photograp… | 25.53% |
| Toys, Children & Baby | 24.03% |

### Language

| | |
|---|---|
| English | 49.21% |
| Spanish | 13.94% |
| Russian | 9.93% |

2020-10-01   Billie Eilish Report

## Notable Followers

| Influencer | | Likes | Followers |
|---|---|---|---|
| Ariana Grande @arianagrande | | 4.5m | 203m |
| Kylie 🤍 @kyliejenner | | 7.4m | 196m |
| Selena Gomez @selenagomez | | 5m | 194m |
| Justin Bieber @justinbieber | | 1.7m | 148m |
| Kendall @kendalljenner | | 4.5m | 140m |
| Barbie @nickiminaj | | 4.6m | 123m |
| KATY PERRY @katyperry | | 636k | 107m |
| Demi Lovato @ddlovato | | 864k | 93m |
| Cardi B @iamcardib | | 2m | 76m |
| champagnepapi @champagnepapi | | 1.6m | 72m |
| Justin Timberlake @justintimberlake | | 207k | 59m |
| Gigi Hadid @gigihadid | | 4.6m | 59m |
| Priyanka Chopra Jonas @priyankachopra | | 1.1m | 58m |
| Shawn Mendes @shawnmendes | | 2.9m | 56m |
| DUA LIPA @dualipa | | 1.7m | 53m |

| Influencer | | Likes | Followers |
|---|---|---|---|
| snoopdogg @snoopdogg | | 194k | 52m |
| Alia Bhatt ☀️ @aliaabhatt | | 1.1m | 50m |
| Jacqueline Fernandez @jacquelinef143 | | 792k | 46m |
| Whindersson Nunes 🏠 @whinderssonnunes | | 1.3m | 45m |
| Cara Delevingne @caradelevingne | | 406k | 44m |
| J Balvin @jbalvin | | 764k | 44m |
| Lele Pons @lelepons | | 1.4m | 42m |
| Sergio Ramos @sergioramos | | 1m | 41m |
| Gucci Official @gucci | | 82k | 41m |
| Bruna Marquezine ♡ @brunamarquezine | | 794k | 40m |
| 👹Vanessa Hudgens👹 @vanessahudgens | | 654k | 39m |
| DOVE @dovecameron | | 1.5m | 38m |
| H&M @hm | | 95k | 36m |
| mills @milliebobbybrown | | 3.6m | 36m |
| Jennifer Aniston @jenniferaniston | | 3.4m | 36m |

October 01, 2020 — @billieeilish

6

2020-10-01   Billie Eilish Report

## Notable Likers

| Influencer | | Likes | Followers |
|---|---|---|---|
| Daquan | @daquan | 513k | 16m |
| Jocelin Zuckerman | @jocelinazuckerman | 54k | 798k |
| Fabio Mufañas | @fabiomnz | 69k | 565k |
| Аниса Муртаева | @anisamurtaeva | 4.4k | 452k |
| 300 \| 🧸🖤مارلين | @marleen.alhii | 30k | 273k |
| Ayo & teo fp 🔵 | @ayoteonation | 332 | 218k |
| YUNIMAT🐺⚡ | @yunimat | 41k | 209k |
| Montserrat | @montserratlanegra | 6.1k | 184k |
| Billie Eilish Closet | @eilishoutfits | 8.6k | 176k |
| TAMERLANALENA | @tamerlan_alena | 1.9k | 173k |
| Wiktoria Ryczko | @wiktoriaryczko | 3.8k | 128k |
| mallrat | @lilmallrat | 8.9k | 106k |
| Helen Housby | @helenhousby1 | 6.4k | 83k |
| Kevyn Cruz | @keityn | 6.1k | 76k |
| Pure Negga Official | @purenegga | 3k | 66k |

| Influencer | | Likes | Followers |
|---|---|---|---|
| 🃏The Joker🃏 | @mp_joker_official | 2.7k | 42k |
| Rose | @radiorose | 1.6k | 41k |
| Be happy 🦋 | @toplovin | 11k | 33k |
| MILLIE INNES | @millieinnes | 1.9k | 32k |
| Aina Ozawa | @ainaozawa | 2.8k | 28k |
| Daniela Vidal | @_danyvidal_ | 689 | 26k |
| АЛОХА я Анька📷 | @annememass | 4.1k | 21k |
| K I A R A | @itskiara_aa | 738 | 21k |
| MEHLOVE Music | @mehlove | 2k | 20k |
| BELGA🇧🇪 | @victor.belga | 433 | 20k |
| 9ma | @9maofficial | 1.2k | 20k |
| Stay classy. | @mirandamaria02 | 1.1k | 16k |
| Rodrigo Lima 👦 | @rodrigo.limam | 788 | 14k |
| 🔥xjoel markes 🔥 | @xjoel1415 | 1.6k | 14k |
| ✖Rÿän✖ | @deathby_ryan | 12 | 13k |

2020-10-01   Billie Eilish Report

## Audience Lookalikes

| Influencer | | Likes | Followers |
|---|---|---|---|
| FINNEAS | @finneas | 284k | 2.7m |
| halsey | @iamhalsey | 1.8m | 21m |
| blōhsh | @blohsh | 336k | 1.3m |
| Billie Eilish | @billiefuckingeilish | 13k | 421k |
| Khalid | @thegr8khalid | 358k | 7.7m |
| Melanie Martinez | @littlebodybigheart | 1.1m | 8.5m |
| | @postmalone | 2m | 23m |
| Zhavia | @zhaviaward | 365k | 3.4m |
| DUA LIPA | @dualipa | 1.7m | 53m |
| Sam Smith | @samsmith | 267k | 15m |
| MAKE OUT HILL | @xxxtentacion | 30m | 18m |
| LIL XAN/DIEGO 💔 | @xanxiety | 216k | 5.3m |
| noah | @noahcyrus | 173k | 5.8m |
| Bhabie 🦋 | @bhadbhabie | 438k | 18m |
| Cardi B | @iamcardib | 2m | 76m |

| Influencer | | Likes | Followers |
|---|---|---|---|
| YUNGBLUD | @yungblud | 355k | 2.5m |
| camila | @camila_cabello | 1.1m | 50m |
| Lana Del Rey | @lanadelrey | 722k | 17m |
| bazzi | @bazzi | 183k | 1.7m |
| Billie Eilish | @billieisaesthetic | 6.8k | 265k |
| Jessie Reyez | @jessiereyez | 128k | 2.1m |
| Shawn Mendes | @shawnmendes | 2.9m | 56m |
| | @lilpeep | 821k | 6.2m |
| blackbear | @bear | 196k | 3.1m |
| ALESSIA CARA | @alessiasmusic | 220k | 3.7m |
| ANNE-MARIE | @annemarie | 285k | 6.5m |
| Alec Benjamin | @alecbenjamin | 179k | 1.6m |
| James Charles | @jamescharles | 2.9m | 22m |
| Ariana Grande | @arianagrande | 4.5m | 203m |
| LA ROSALÍA | @rosalia.vt | 1.4m | 13m |

## Popular #hashtags

| Hashtag | Percent |
| --- | --- |
| #mycalvins | 22.22% |
| #mytruth | 22.22% |
| #blacklivesmatter | 22.22% |
| #justiceforgeorgefloyd | 11.11% |
| #mcmaw19 | 11.11% |
| #climateemergency | 11.11% |
| #climatestrike | 11.11% |
| #justiceforrayshard | 11.11% |
| #justiceforbreonnataylor | 11.11% |
| #mcmidentities | 11.11% |
| #fridaysforfuture | 11.11% |

## Popular @mentions

| Mention | Percent |
| --- | --- |
| @mattyvogel | 12.5% |
| @blohsh | 12.5% |
| @tammytaylornails | 6.25% |
| @nbcsnl | 4.69% |
| @gettyentertainment | 4.69% |
| @recordingacademy | 3.13% |
| @robrumseymua | 3.13% |
| @billiejoearmstrong | 3.13% |
| @finneas | 3.13% |
| @chanelofficial | 3.13% |
| @freakcityla | 3.13% |
| @007 | 3.13% |
| @jasonandersonart | 3.13% |
| @calvinklein | 3.13% |
| @rollingstone | 3.13% |

## Popular @mentions

| Mention | Percent |
|---|---|
| @kennethcappello | 3.13% |
| @burberry | 3.13% |

## Gender Split

| Gender | Followers | Likes |
|---|---|---|
| Male | 19,662,053 / 29.42% | 1,590,486 / 22.9% |
| Female | 47,172,939 / 70.58% | 5,354,775 / 77.1% |

## Ethnicity

| Group | Followers | Likes |
|---|---|---|
| White / Caucasian | 43,475,227 / 65.05% | 4,482,715 / 64.54% |
| Asian | 9,274,692 / 13.88% | 1,120,680 / 16.14% |
| African American | 4,637,346 / 6.94% | 412,882 / 5.94% |
| Hispanic | 9,447,728 / 14.14% | 928,984 / 13.38% |

## Languages of Audience

| Language | Followers | Likes |
|---|---|---|
| English | 34,233,083 / 51.22% | 3,417,742 / 49.21% |
| Spanish | 9,063,293 / 13.56% | 968,357 / 13.94% |
| Russian | 5,466,033 / 8.18% | 689,762 / 9.93% |
| Portuguese | 4,753,104 / 7.11% | 399,769 / 5.76% |
| French | 1,760,835 / 2.63% | 190,564 / 2.74% |
| Italian | 1,760,835 / 2.63% | 155,352 / 2.24% |
| Indonesian | 1,047,839 / 1.57% | 136,711 / 1.97% |
| German | 1,253,089 / 1.87% | 123,244 / 1.77% |
| Arabic | 1,544,757 / 2.31% | 95,282 / 1.37% |
| Polish | 626,511 / 0.94% | 95,282 / 1.37% |

## Age Split

| Age | Followers | Likes |
|---|---|---|
| 13-17 | 9,084,947 / 13.59% | 1,125,702 / 16.21% |
| 18-24 | 38,895,626 / 58.2% | 4,063,158 / 58.5% |
| 25-34 | 16,126,214 / 24.13% | 1,568,427 / 22.58% |
| 35-44 | 2,186,373 / 3.27% | 153,254 / 2.21% |
| 45-64 | 541,898 / 0.81% | 34,712 / 0.5% |

## Male Age Split

| Age | Followers | Likes |
|---|---|---|
| 13-17 | 1,527,380 / 2.29% | 146,566 / 2.11% |
| 18-24 | 10,711,778 / 16.03% | 898,376 / 12.94% |
| 25-34 | 6,017,756 / 9% | 456,880 / 6.58% |
| 35-44 | 977,529 / 1.46% | 68,758 / 0.99% |
| 45-64 | 427,677 / 0.64% | 19,905 / 0.29% |

## Female Age Split

| Age | Followers | Likes |
|---|---|---|
| 13-17 | 7,557,567 / 11.31% | 979,136 / 14.1% |
| 18-24 | 28,183,848 / 42.17% | 3,164,782 / 45.57% |
| 25-34 | 10,108,458 / 15.12% | 1,111,547 / 16% |
| 35-44 | 1,208,845 / 1.81% | 84,496 / 1.22% |
| 45-64 | 114,221 / 0.17% | 14,807 / 0.21% |

## Location by Country

| Country | Followers | Likes |
|---|---|---|
| 🇺🇸 United States | 16,731,606 / 25.03% | 1,636,783 / 23.57% |
| 🇷🇺 Russia | 4,022,932 / 6.02% | 457,582 / 6.59% |
| 🇧🇷 Brazil | 4,754,307 / 7.11% | 381,545 / 5.49% |
| 🇮🇩 Indonesia | 2,605,763 / 3.9% | 360,813 / 5.2% |
| 🇲🇽 Mexico | 2,651,478 / 3.97% | 276,484 / 3.98% |
| 🇮🇹 Italy | 2,483,856 / 3.72% | 244,688 / 3.52% |
| 🇬🇧 United Kingdom | 2,514,332 / 3.76% | 203,218 / 2.93% |
| 🇦🇷 Argentina | 1,600,030 / 2.39% | 179,716 / 2.59% |
| 🇫🇷 France | 1,401,931 / 2.1% | 176,951 / 2.55% |
| 🇺🇦 Ukraine | 1,280,024 / 1.92% | 172,805 / 2.49% |
| 🇩🇪 Germany | 1,508,599 / 2.26% | 168,652 / 2.43% |
| 🇮🇳 India | 1,066,686 / 1.6% | 128,564 / 1.85% |
| 🇨🇦 Canada | 1,310,501 / 1.96% | 125,800 / 1.81% |
| 🇨🇱 Chile | 1,188,593 / 1.78% | 109,214 / 1.57% |
| 🇵🇱 Poland | 899,064 / 1.35% | 106,443 / 1.53% |
| 🇲🇾 Malaysia | | 103,679 / 1.49% |
| 🇪🇸 Spain | 1,005,733 / 1.5% | 102,297 / 1.47% |

## Location by US State

| State | Followers | Likes |
|---|---|---|
| California | 2,529,571 / 3.78% | 313,808 / 4.52% |
| Texas | 1,493,361 / 2.23% | 142,392 / 2.05% |
| New York | 1,447,646 / 2.17% | 123,035 / 1.77% |
| Florida | 1,386,692 / 2.07% | 95,386 / 1.37% |
| Illinois | 457,151 / 0.68% | 64,973 / 0.94% |
| Georgia | 518,105 / 0.78% | 55,298 / 0.8% |
| Pennsylvania | 441,913 / 0.66% | 40,088 / 0.58% |
| Arizona | 411,436 / 0.62% | 38,706 / 0.56% |
| Nevada | | 35,942 / 0.52% |
| North Carolina | 457,151 / 0.68% | |
| Tennessee | 380,959 / 0.57% | |
| Washington | 365,721 / 0.55% | |
| Michigan | 335,244 / 0.5% | |

2020-10-01  Billie Eilish Report

## Location by City by Followers

| City | Followers |
|------|-----------|
| 🇺🇸 New York City | 975,256 / 1.46% |
| 🇷🇺 Moscow | 914,303 / 1.37% |
| 🇧🇷 São Paulo | 853,349 / 1.28% |
| 🇺🇸 Los Angeles | 838,111 / 1.25% |
| 🇬🇧 London | 502,866 / 0.75% |
| 🇲🇽 Mexico City | 457,151 / 0.68% |
| 🇨🇱 Santiago | 365,721 / 0.55% |
| 🇮🇩 Jakarta | 365,721 / 0.55% |
| 🇰🇷 Seoul | 350,483 / 0.52% |
| 🇷🇺 Saint Petersburg | 350,483 / 0.52% |

## Location by City by Likes

| City | Likes |
|------|-------|
| 🇺🇸 Los Angeles | 114,743 / 1.65% |
| 🇷🇺 Moscow | 81,565 / 1.17% |
| 🇺🇸 New York City | 80,183 / 1.15% |
| 🇧🇷 São Paulo | 69,119 / 1% |
| 🇲🇽 Mexico City | 62,209 / 0.9% |
| 🇬🇧 London | 42,852 / 0.62% |
| 🇮🇩 Jakarta | 41,470 / 0.6% |

## Audience Interest Affinity

| Interest | Followers | Followers affinity | Likes | Likers affinity |
|---|---|---|---|---|
| Friends, Family & Relationships | 20,941,809 / 31.33% | 1.12 | 2,266,211 / 32.63% | 1.17 |
| Music | 18,557,738 / 27.77% | 1.64 | 2,020,925 / 29.1% | 1.71 |
| Clothes, Shoes, Handbags & Accessories | 17,826,296 / 26.67% | 1.06 | 1,887,618 / 27.18% | 1.08 |
| Camera & Photography | 17,772,093 / 26.59% | 1.20 | 1,772,972 / 25.53% | 1.15 |
| Toys, Children & Baby | 15,496,428 / 23.19% | 1.10 | 1,668,995 / 24.03% | 1.14 |
| Television & Film | 17,392,804 / 26.02% | 1.46 | 1,621,003 / 23.34% | 1.31 |
| Restaurants, Food & Grocery | 15,631,836 / 23.39% | 0.91 | 1,578,345 / 22.73% | 0.89 |
| Travel, Tourism & Aviation | 15,117,140 / 22.62% | 1.07 | 1,554,349 / 22.38% | 1.05 |
| Art & Design | 14,954,597 / 22.38% | 1.44 | 1,541,021 / 22.19% | 1.43 |
| Pets | 12,435,051 / 18.61% | 1.16 | 1,277,074 / 18.39% | 1.15 |
| Beauty & Cosmetics | 12,597,594 / 18.85% | 1.17 | 1,255,745 / 18.08% | 1.12 |
| Coffee, Tea & Beverages | 9,292,403 / 13.9% | 1.13 | 1,037,122 / 14.93% | 1.21 |
| Electronics & Computers | 11,297,186 / 16.9% | 1.14 | 1,029,128 / 14.82% | 1.00 |
| Sports | 11,107,575 / 16.62% | 0.94 | 983,803 / 14.17% | 0.80 |
| Cars & Motorbikes | 8,642,232 / 12.93% | 0.83 | 797,170 / 11.48% | 0.74 |

2020-10-01 Billie Eilish Report

# Audience Brand Affinity

| Brand | | Followers | Followers affinity | Likes | Likers affinity |
|---|---|---|---|---|---|
| | Walt Disney | 6,312,364 / 9.44% | 1.04 | 794,503 / 11.44% | 1.26 |
| | Starbucks | 3,874,090 / 5.8% | 1.02 | 525,228 / 7.56% | 1.34 |
| | Apple | 5,526,719 / 8.27% | 0.73 | 455,908 / 6.56% | 0.58 |
| | Nike | 2,817,496 / 4.22% | 0.81 | 341,262 / 4.91% | 0.94 |
| | Adidas | 2,546,614 / 3.81% | 0.85 | 274,609 / 3.95% | 0.89 |
| | Vans | 2,113,122 / 3.16% | 1.75 | 234,618 / 3.38% | 1.87 |
| | Marvel Entertainment | 1,598,426 / 2.39% | 0.96 | 194,627 / 2.8% | 1.12 |
| | DC Entertainment | 1,733,833 / 2.59% | 0.66 | 191,960 / 2.76% | 0.71 |
| | Netflix | 2,573,682 / 3.85% | 1.31 | 175,965 / 2.53% | 0.86 |
| | musical.ly | 1,435,883 / 2.15% | 1.48 | 165,297 / 2.38% | 1.64 |
| | Polaroid | 1,435,883 / 2.15% | 2.08 | 151,969 / 2.19% | 2.12 |
| | Pokemon | 1,300,408 / 1.95% | 0.79 | 149,302 / 2.15% | 0.88 |
| | Star Wars | 1,002,391 / 1.5% | 0.63 | 138,641 / 2% | 0.84 |
| | Spotify Music | 1,300,408 / 1.95% | 1.33 | 133,307 / 1.92% | 1.31 |
| | Coachella | 1,002,391 / 1.5% | 2.37 | 119,972 / 1.73% | 2.73 |

2020-10-01    Billie Eilish Report

## Influencer Brand Affinity

| Brand | Interest |
|-------|----------|
| 🍎 Apple | 🎵 Music |
|  | 🖥 Electronics & Computers |
| — Bershka | 👕 Clothes, Shoes, Handbags & Accessories |
| iHeartRadio Music Awards | 🎵 Music |
| Justin Bieber | 🎵 Music |
| ▪ Mazda | ✴ Cars & Motorbikes |
| NETFLIX Netflix | 🖥 Television & Film |
| 🟢 Spotify Music | 🎵 Music |

## Sponsored Posts



August 29, 2019 10:02

BERSHKA COLLAB OUT NOW

| Likes | Comments |
|---|---|
| **4,183,564** | **40,664** |



July 17, 2019 23:37

@MCMWORLDWIDE #MCMIDENTITIES #MCMAW19

| Likes | Comments |
|---|---|
| **3,782,494** | **26,568** |



May 9, 2019 23:00

#MYTRUTH #MYCALVINS

| Likes | Comments |
|---|---|
| **5,329,296** | **45,091** |



May 9, 2019 19:00

#MYTRUTH #MYCALVINS

| Likes | Comments |
|---|---|
| **4,838,851** | **22,573** |

## Popular Posts









| | | | |
|---|---|---|---|
| January 27, 2020 20:06 | January 10, 2020 19:22 | July 24, 2020 18:22 | January 28, 2020 05:02 |
| FIVE ARE YOU KIDDING | been gone | "my future" out thursday |  |

Likes
**13,334,550**

Comments
**195,303**

Likes
**12,816,279**

Comments
**132,398**

Likes
**11,684,669**

Comments
**157,339**

Likes
**11,667,715**

Comments
**70,502**

October 01, 2020 — @billieeilish

19

2020-10-01   Billie Eilish Report

## Popular Posts









March 29, 2020 17:52

my debut album "when we all fall asleep, where do we go" came out a year ago today😊😊😊 thank you for changing my life (heres a new picture from da shoot😛)

April 18, 2020 02:39



July 11, 2019 19:11

BAD GUY FEAT. JUSTIN BIEBER OUT NOWWW OMGFFFFGGG ANYTHING IS POSSIBLE MAN

August 3, 2020 18:19

can't you hear me?

| | | |
|---|---|---|
| Likes | | Comments |
| 11,529,384 | | 93,756 |

| | | |
|---|---|---|
| Likes | | Comments |
| 11,473,756 | | 96,926 |

| | | |
|---|---|---|
| Likes | | Comments |
| 10,865,396 | | 116,618 |

| | | |
|---|---|---|
| Likes | | Comments |
| 10,539,376 | | 189,762 |

EXHIBIT K





**Whois results: iqdata.social is already registered.** Want it? Make an offer now.

✕ iqdata.social ( TAKEN )                                          [ $ Make offer ]

Domain name: iqdata.social
Registry Domain ID: 94f4f6cda7db4d2b92f293682537941e-DONUTS
Registrar WHOIS Server: whois.namecheap.com
Registrar URL: http://www.namecheap.com
Updated Date: 0001-01-01T00:00:00.00Z
Creation Date: 2021-05-17T16:23:50.33Z
Registrar Registration Expiration Date: 2022-05-17T16:23:50.33Z
Registrar: NAMECHEAP INC
Registrar IANA ID: 1068
Registrar Abuse Contact Email: abuse@namecheap.com
Registrar Abuse Contact Phone: +1.6613102107
Reseller: NAMECHEAP INC
Domain Status: clientTransferProhibited https://icann.org/epp#clientTransferProhibited
Registry Registrant ID:
Registrant Name: Withheld for Privacy Purposes
Registrant Organization: Privacy service provided by Withheld for Privacy ehf
Registrant Street: Kalkofnsvegur 2
Registrant City: Reykjavik
Registrant State/Province: Capital Region
Registrant Postal Code: 101
Registrant Country: IS
Registrant Phone: +354.4212434
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: 27c3b4abe504489b98a25f268182475b.protect@withheldforprivacy.com
Registry Admin ID:
Admin Name: Withheld for Privacy Purposes
Admin Organization: Privacy service provided by Withheld for Privacy ehf
Admin Street: Kalkofnsvegur 2
Admin City: Reykjavik
Admin State/Province: Capital Region
Admin Postal Code: 101
Admin Country: IS
Admin Phone: +354.4212434
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: 27c3b4abe504489b98a25f268182475b.protect@withheldforprivacy.com
Registry Tech ID:
Tech Name: Withheld for Privacy Purposes
Tech Organization: Privacy service provided by Withheld for Privacy ehf
Tech Street: Kalkofnsvegur 2
Tech City: Reykjavik
Tech State/Province: Capital Region
Tech Postal Code: 101
Tech Country: IS
Tech Phone: +354.4212434
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: 27c3b4abe504489b98a25f268182475b.protect@withheldforprivacy.com
Name Server: ns.387.zwidec.47.com

2021-10-11 Screenshot from namecheap.com

Name Server: ns-585.awsdns-47.com
Name Server: ns-949.awsdns-54.net
Name Server: ns-1928.awsdns-49.co.uk
Name Server: ns-1149.awsdns-15.org
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of WHOIS database: 2021-10-11T00:01:09.93Z <<<
For more information on Whois status codes, please visit https://icann.org/epp

Need help? We're always here for you.     Chat with a Live Person



namecheap

We make registering, hosting, and managing domains for yourself or others easy and affordable, because the internet needs people.

**Learn more about Namecheap →**
**Read our blog →**

**Join Our Newsletter & Marketing Communication**
We'll send you news and offers.

you@yours.com          Join

**Domains**
Domain Name Search
Domain Transfer
New TLDs
Personal Domain
Marketplace
Whois Lookup
PremiumDNS
FreeDNS

**Hosting**
Shared Hosting
WordPress Hosting
Reseller Hosting
VPS Hosting
Dedicated Servers
Private Email Hosting
Migrate to Namecheap

**WordPress**
Shared Hosting
WordPress Hosting
Migrate WordPress

**Security**
Domain Privacy
PremiumDNS
VPN  UPDATED
2FA
Public DNS

**Transfer to Us**  TRY ME
Domain Transfer
Migrate Hosting
Migrate WordPress
Migrate Email

**SSL Certificates**
Comodo
Organization Validation
Domain Validation
Extended Validation
Single Domain
Wildcard
Multi-Domain

**Resellers**
SSL Certificates
Reseller Hosting

**Promos**

**Guru Guides**

**Help Center**
Status Updates
Knowledgebase
How-To Videos
Submit Ticket
Live Chat
Report Abuse

**Apps**
Marketplace
CDN
Visual
Site Maker
Logo Maker
Business Card Maker
ID Validation
Subscriptions

**Careers**

**Affiliates**

**Send us Feedback**

The entirety of this site is protected by copyright © 2000–2021 Namecheap, Inc.
4600 East Washington Street, Suite 305, Phoenix, AZ 85034, USA

Terms and Conditions    Privacy Policy    UDRP

WE SUPPORT     ELECTRONIC FRONTIER FOUNDATION    FIGHT FOR THE FUTURE

We are an ICANN accredited registrar.
Serving customers since 2001.

Payment Options




URL: https://www.namecheap.com/domains/whois/result?domain=iqdata.social

# EXHIBIT L

Contact Us ✉

 iqdata

Sign Up →

## Sign In to your account

Email *

Password *

☑ Remember me for 30 days

**Submit**

Forgot password

URL: https://iqdata.social/sign-in

# EXHIBIT M

**PERKINS COIE**

3150 Porter Drive
Palo Alto, CA 94304-1212

T. +1.650.838.4300
F. +1.650.838.4350
PerkinsCoie.com

May 20, 2021

Gabriella Gallego

D.  +1.650.838.4815
F.  +1.650.838.4350

**VIA EMAIL**

Mariska Supra
Director - Social Data Trading Ltd.

18 Anaboom Crescent, Melody,
Hartbeespoort 0216,
Republic of South Africa

Aleksei Poliakov
Beneficial Owner – Social Data Trading Ltd.

Apt. 104
25 Borovskoe Highway
Moscow, 119633
Russian Federation

Adhar Singh
Vice President - Social Data Trading Ltd.



Social Data Trading Ltd.
7F, MW Tower,
111 Bonham Strand,
Sheung Wan,
Hong Kong

**Re:     Cease and Desist of Facebook and Instagram - Social Data Trading Ltd.**

Mses. Supra, Poliakov, and Singh:

We represent Facebook, Inc., based in Menlo Park, California ("Facebook").  Facebook operates,
among other products, Instagram.  Facebook has gathered evidence that your service, Social

Social Data
May 20, 2021
Page 2

Data, which uses the website socialdata.hk, scrapes user data from Instagram and supplies this data to third parties for a fee. These activities violate Facebook's and Instagram's terms and policies.

Pursuant to the terms of service and privacy policy at socialdata.hk, Social Data Trading Ltd. provides the services at socialdata.hk.  Facebook is aware that you previously operated under the name Social Data Ltd., and it revoked your license to access Facebook and Instagram permanently in April 2021.  Your current activities constitute unauthorized access to Facebook and Instagram systems.

**Facebook demands that you stop your activities immediately.**

Facebook takes the protection of the user experience very seriously, and it is committed to keeping its products safe for users to interact and share information.  Facebook has developed terms and policies to protect the user experience and facilitate these goals.

Facebook's and Instagram's terms prohibit, among other things:

- Accessing and/or collecting users' content or information through automated means without Facebook's prior express written permission;

- Using or sharing user data without the users' consent;

- Creating accounts for the purpose of misleading others or violating the terms;

- Impairing the intended operation of Facebook and Instagram; and

- Helping or encouraging others to violate Facebook and Instagram's terms or policies.

*See* Facebook's Terms of Service, https://www.facebook.com/legal/terms, and Instagram Terms of Use, http://instagram.com/about/legal/terms/.

In addition to breaching the terms of service and interfering with Facebook's business expectations and interests, your activities may violate other federal and state laws.  *See* Computer Fraud and Abuse Act, 18 U.S.C. § 1030; Copyright Act, 17 U.S.C. § 101 *et seq.*; and the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502.

Facebook has taken technical steps to deactivate your Facebook and Instagram accounts, and hereby revokes Ms. Supra, Mr. Poliakov, Mr. Singh, and Social Data Trading Ltd.'s limited licenses to access Facebook and Instagram, along with the limited licenses of their affiliates and subsidiaries.  **This means that you, your agents, employees, affiliates, or anyone acting on**

Social Data
May 20, 2021
Page 3

**your behalf ("You" or "Your") may not access the Facebook or Instagram websites, mobile applications, Platforms, services, or networks for any reason whatsoever.**  Facebook will treat any further activity by You on its websites, mobile applications, Platforms, services, or networks as intentional and unauthorized access to its protected computer networks.

**Please respond to me <u>WITHIN 48</u> hours confirming that You:**

- Have stopped and will not in the future access the Facebook and Instagram websites and/or use Facebook's and Instagram's services for any reason whatsoever;

- Have shut down any and all websites you operate that are used to offer services related to Facebook or Instagram, and have removed all advertisements or postings on external websites advertising or describing Your services related to Facebook or Instagram;

- Have preserved and will continue to preserve in the future all information related to the activities described herein;

- Have stopped and will not in the future offer, transfer, market, sell, or offer to sell any services related to Facebook or Instagram;

- Will account for and disgorge any and all revenue earned from Your unauthorized activities related to Facebook or Instagram;

- Have secured all Facebook or Instagram data under Your control and ensured it is no longer accessible;

- Will, following the accounting required below, delete all data obtained from Facebook or Instagram; and

- Will enter into a written agreement memorializing Your commitment to compliance with the demands in this letter.

**Along with Your response, You must provide the following information:**

- A complete list of each and every product You created that offers insights or analytics about Instagram users or relies in any way on data obtained from Facebook or Instagram;

- A complete accounting of all compensation or revenue received by You in connection with your unauthorized services;

2021-05-20 - Social Data Trading C&D

Social Data
May 20, 2021
Page 4

- A detailed description of the methods You used to obtain data from Facebook, Instagram, or any of its affiliate companies;

- A copy of each and every version of any software code You have developed or used to automate access to or scrape data from the Facebook or Instagram websites and/or services, including any libraries, frameworks, or other code, and the source for that code if not Your own development;

- An accounting of any individual or entity who owns any portion of or exercises any control over Social Data Trading Ltd. or Adquantum Trading Ltd; and

- A complete accounting of all Facebook or Instagram data that You obtained from Facebook or Instagram, and a certification that this information has been deleted and destroyed.

If you ignore this letter and continue your current improper conduct, Facebook will take whatever measures it believes are necessary to enforce its rights, maintain the quality of its websites, and protect users' information and privacy.

This letter is not intended by us, and should not be construed by you, as a waiver or relinquishment of any of Facebook's rights or remedies in this matter. Facebook specifically reserves all such rights and remedies whether at law or in equity, under applicable domestic and foreign laws.

Very truly yours,

Gabriella Gallego

cc:  privacy@socialdata.hk

# EXHIBIT N

2021-06-03 Perkins response to Adhar Singh

**From:**
**To:**
**Subject:**    RE: Cease and Desist of Facebook and Instagram - Social Data Trading Ltd.
**Date:**     Thursday, June 3, 2021 10:33:00 AM

Dear Mr. Singh:

Thank you for your response.  Your letter concedes that you have been collecting data through your provision of the services through these entities.

As requested in Facebook's letter, please provide responses to our inquiries regarding your use, collection, and scraping of Facebook and Instagram user data.  Specifically, please provide a complete list of the following:

- Each and every product or service you created, offer, or provide that offers insights or analytics about Instagram users or uses in any way on data obtained from Facebook or Instagram;
- A complete accounting of all compensation or revenue received by you in connection with those products or services;
- A complete accounting of all Facebook or Instagram data that you obtained from Facebook or Instagram or from third parties, including a description of the data and the source from which it was obtained;
- A detailed description of the methods you used to obtain data from Facebook, Instagram, or any of its affiliate companies;
- Identification of all third-parties from whom you procure data from Facebook or Instagram, or about Facebook or Instagram users;
- A copy of each and every version of any software code you have developed or used to collect data from the Facebook or Instagram websites and/or services, including any libraries, frameworks, or other code, and the source for that code;
- An identification of each person or entity that has developed the code used to collect data from Facebook or Instagram;
- An identification of each individual or entity who owns any portion of or exercises any control over Social Data Ltd., Social Data Trading Ltd., Zavarus Ltd., AdQuantum Ltd., or any other corporate entities that have been used to provide the violating services;
- An identification of the individuals and entities you have worked with to provide nominee director services for Social Data Ltd., Social Data Trading Ltd., Zavarus Ltd., or any of the Quantum companies or their predecessor, successor, or affiliate entities; and
- A description of your role, work, and affiliation with the AdQuantum Ltd., AppQuantum Publishing Ltd., PlayQuantum Ltd., AppDaddy, Fitingo, ECPI, family of companies, and any individuals associated with these entities.

Until you have accounted for all of this information and provided it to me, please do not delete or destroy any of the requested data or records.

Apart from this, Facebook disagrees with your argument that *hiQ Labs, Inc. v. LinkedIn* stands for the

proposition that the services you offered do not violate the law; we invite you to provide the basis for your position.

In view of Facebook's cease and desist letter, your license to access the platform remains revoked. We look forward to your prompt response.

**Gabriella Gallego | Perkins Coie LLP**
ASSOCIATE
3150 Porter Drive
Palo Alto, CA 94304-1212
D. +1.650.838.4815
F. +1.650.838.4350



**From:** Adhar Singh
**Sent:** Saturday, May 22, 2021 4:30 AM
**To:** Gallego, Gabriella (PAO)
**Subject:** Re: Cease and Desist of Facebook and Instagram - Social Data Trading Ltd.

Hello,

Thank you for reaching out.

As per my knowledge, the service that we provided was fully compliant with the relevant legislation and dealt solely with analysing publicly available data. As you may know, in light of the decision in hiQ Labs, Inc. v. LinkedIn Corp, such an activity is not in breach of the laws alleged in your letter (or any laws, for that matter).

Accessing and analysing publicly available information is a fundamental right, whether done by hand on paper or through the assistance of technology.

It would be inappropriate to get involved in any further discussions until you have provided evidence that led you to make such unsubstantiated allegations. It is not Social Data that has to prove its innocence but the party putting forward an allegation that must provide the basis for its allegations.

Kind regards.

On Fri, May 21, 2021 at 7:10 AM Gallego, Gabriella (Perkins Coie)
wrote:

> Mses. Supra, Poliakov, and Singh:
>
> Please open, read, and response to the attached letter sent on behalf of Facebook, Inc.

2021-06-03 - Perkins' response to Adnal Singh

**Gabriella Gallego** | **Perkins Coie LLP**
ASSOCIATE
3150 Porter Drive
Palo Alto, CA 94304-1212
D. +1.650.838.4815
F. +1.650.838.4350



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.